# STATE OF MARYLAND, Use of ANNIE L. COCK-ING et al., vs. GEORGE W. WADE et al.

*Sheriffs—Lynching of Prisoner by Mob—Negligence in Custody of Prisoner—Liability of Sheriff and Sureties.*

A person charged with murder and confined in a county jail was forcibly taken thence by a mob and lynched. In an action against the sheriff by the children of the prisoner to recover damages for negligence in his custody, whereby his death was caused, the declaration alleged that the sheriff had been warned of the existence of public excitement concerning the crime charged against the prisoner, and had been requested to confine him in a more secure place, but refused to do so and removed the guards previously stationed at the jail and gave the keys to an old and infirm negro; that this negro, upon the demand of the mob, delivered the prisoner to them, and that the sheriff was present at the hanging of the prisoner by the mob and offered no resistance thereto. *Held*, upon demurrer, that the sheriff was not liable in the action, there being no allegation that he acted with malice towards the prisoner or participated in the violence of the mob, or was able to resist them, and the prisoner having been confined in the county jail, which was the proper place for his custody. If in such case the sheriff had sufficient means at hand to resist the mob but failed to do so, he would be liable.

Under Code, Art. 87, secs. 43, &c., it is the duty of the sheriff to keep a prisoner committed to his custody in the county jail unless it becomes necessary to remove him elsewhere. It is for the sheriff to determine when such necessity exists, and if in the honest exercise of that discretion he fails to remove a prisoner in time to avert a threatened danger, he is not civilly liable.

It is the duty of the sheriff of the county to preserve the public peace. For neglect in the performance of that duty he is punishable by indictment, but no civil action therefor lies against him by persons who have suffered injury from the violence of mobs or insurrections.

The sureties upon a sheriff's bond are not liable for a wrong committed by him in aiding and abetting a mob in lynching a prisoner committed to his custody.

Appeal from a judgment of the Circuit Court for Charles County.

The cause was argued before McSherry, C. J., Fowler, Page, Page, Boyd and Pearce, JJ. (March 15, 1898).

VOL. 87            34

*Randolph Barton, Jr.*, and *Herbert B. Stimpson* (with whom was *John Grason* on the brief), for the appellant.

Must it not follow, that if a sheriff is held liable for his negligence in regard to mere goods placed in his custody, he owes an equal duty toward the life of a human being that is placed in his control and custody? If he is liable in the one case, we submit he is liable in the other. We contend, therefore, that at common law, as it is in force in Maryland to-day, the facts, as stated in the declaration, constitute a good cause of action against the sheriff. That wherever it has been sought to hold the sheriff liable for his non-performance of this particular duty to " keep his prisoner safe," notably in the case of " escapes " and the loss of slaves, the Courts have always held him liable in damages, upon the ground that it was a failure to perform a ministerial duty ; and while it is true that an action upon the peculiar facts, as stated in the declaration, has been extremely rare, yet the present suit is merely the application of old principles to new facts. There is a distinction between this case and the damage suits brought in consequence of the lynching of members of the " Mafia Society," following upon the celebrated Hennessy murder in New Orleans, several years ago. In these cases (some of the few in which it has been sought to recover damages for a death caused by mob violence), recovery was in every instance finally denied. The grounds on which such denial rested do not, however, exist in the case now before the Court, and the distinction involves the application of the principles underlying all questions of this nature.

In the New Orleans cases it was in every instance the *city* that was sued, and the alleged neglect was *failure to suppress the mob;* and the defence was uniformly sustained that the alleged default of the city consisted in its failure to perform a duty in which it acted as the representative of the *sovereign power* of the State, and not in its failure in the performance of a *private* duty imposed upon it by its charter. " Actions to recover from municipal corporations damages

resulting from the acts of mobs, and riotous assemblages are actions to hold such corporations liable in damages for a failure to preserve the public peace. The preservation of the public peace devolves primarily upon the sovereign. Under our system of government, the State is that sovereign, 92 *U. S.* 542. When, by the action of the State, a municipal corporation is charged with the preservation of the peace, and empowered to appoint public boards and other agencies to that end, the corporation *pro tanto* is charged with governmental functions in the public interest and for public purposes, and is entitled to the same immunity as the sovereign granting the power, for negligence in preserving the public peace, unless such liability is expressly declared by the sovereign." *City of New Orleans* v. *Abbagnato*, 62 Fed. Rep., p. 245. And upon the established doctrine that the *State* cannot be sued, except by its consent, for failure in the exercise of its sovereign powers, the *city* as its representative was exonerated from liability. See also *Gianfortune* v. *City of New Orleans*, 61 Fed. Rep. 64.

In these cases, however, the Courts merely followed the ruling laid down in *South* v. *Maryland*, 18 How. 396, that where an individual or a municipality acts as a *conservator of the peace*, he or it represents the sovereign power of the State for that purpose, and is entitled to all the immunities of such sovereign ; and that the right to hold the State, or its duly delegated agents, responsible for a *failure to conserve the peace*, rests only upon express statute, and does not exist otherwise. *State* v. *Mayor and City Council of N. O.*, 109 U. S. 285 ; *M. & C. C. of Balto.* v. *Poultney*, 25 Md. 107 ; *M. & C. C.* v. *Dechert*, 32 Md. 369 ; *M. & C. C.* v. *Dehner*, 37 Md. 180.

In the case at bar, however, the suit is not against the authorities of Charles County, for failure to subdue the mob, nor against the sheriff for failure to conserve the peace ; for that, as we have said, is a duty incident to the sovereign power of the State, and devolving upon those exercising such duty the same immunity possessed by the sovereign.

The action here is brought against the sheriff in his *ministerial* capacity, *not* for failure as guardian of the public peace so to preserve the peace, and thus falling short in a duty owed to the public at large just as much as to the prisoner, but for failure in the performance of a *ministerial* duty, *owed to the prisoner in particular*, to take all proper and reasonable precautions to see that such prisoner's safety was not unduly placed in jeopardy. And the fact that *the means* of the injury was an outbreak on the part of the people, does not affect the question whether the *immediate direct cause* of the prisoner's death was the *criminal* neglect of the sheriff, *not in failing to suppress the mob*, but in knowingly placing a prisoner entrusted to his absolute control in a position where it was evident that he would encounter violence at the mob's hands.

We come now to the statutory liability of the sheriff and our right to recover in this action under the Code of Maryland. It is a principle of law well established in this State, that where a duty has been imposed by statute and no remedy prescribed, the right of action accrued at common law, for otherwise there would be a right without a remedy. *Com. A. A. Co.* v. *Duckett*, 20 Md. 468. Or as it was stated by this Court in *Com. A. A. Co.* v. *Duvall*, 54 Md. 355. "If they fail to do so (that is, fulfill the provisions of the statute) and any injury results, they are liable in an action at law, not by virtue of any liability at common law, but because they are made so by statute." This theory is well illustrated by the case of *Willey* v. *Mulledly*, 78 N. Y. 314, where the doctrine is announced as follows : "It is a general rule, that whenever one owes another a duty, whether such duty be imposed by voluntary contract or by statute, a breach of such duty causing damage gives a cause of action. Duty and right are correlative, and whenever a duty is imposed there must be a right to have it performed. When a statute imposes a duty upon a public officer, it is well settled that any person having a special interest in the performance thereof, may sue for a breach thereof, causing

him damage, and the same is true of a duty imposed by statute upon any citizen." The doctrine has been applied in a great variety of cases, among others, *Phil. W. & B. R. R. Co.* v. *Stebbing*, 62 Md. 516; *Owings* v. *Jones*, 9 Md. 108; *Atkinson* v. *New Castle*, L. R., 6 Exch. 409; *Couch* v. *Steel*, 3 Ellis & Bl. 402; *Butt* v. *Pratt*, 33 Minn. 323; *Hays* v. *Michigan R. R.*, 111 U. S. 228; *Clark* v. *Miller*, 54 N. Y. 534.

These cases establish the doctrine that where a special duty is devolved by statute upon an officer, for the performance of which he receives a remuneration from the fees of his office, and an individual receives a special injury through his non-performance or his negligence in the performance of his statutory duty, the officer becomes immediately liable in damages, for which an action will lie at common law. Code, Art. 87, sec. 43, provides that "the sheriff shall safely keep all persons committed to his custody by lawful authority until such persons are discharged by due course of law." This then is a specific statute requiring the sheriff and making it his duty to "safely keep" the prisoner, and for his failure to perform this statutory duty, he is under the above rule liable in damages. The facts in the declaration show how and under what circumstances this duty arose *to the prisoner personally* and how it was violated by the negligence of the sheriff to his injury. In other words the facts of the declaration show that the negligent breach of this duty, as it is imposed by the statute was the direct and immediate cause of the injury complained of, and that the death of the prisoner would not have occurred, but for the violation of that duty. This principle has been applied to this duty of the sheriff and elaborately discussed in the cases of *Hixon* v. *Cupp*, 49 Pacific Rep. 927, and *Asher* v. *Cabell*, 50 Fed. Rep. 818.

The provisions of the bond required that the sheriff "should well and faithfully execute the office of sheriff of Charles County in all things thereto appertaining, and should well and truly perform all the duties required by law to be

by him performed." These provisions make the bond liable
for the non-performance of the ministerial and statutory
duties of the sheriff, for this bond, which is given to the
State, " is intended for the benefit of individuals, who may
suffer by the misfeasance or malfeasance of the sheriff, as
well as for the benefit of the State, and the State is a mere
trustee of the bond for the use of those who may suffer by
a breach of its condition, whether it be the State or a pri-
vate person." *Skinner* v. *Phillips*, 4 Mass. 68 ; *Logan* v.
*State*, 39 Md. 188. Or as it has been said, "both the
sheriff and his sureties are responsible when the sheriff in
the performance of his official duty is guilty of misconduct
resulting injuriously, whether to one, like a party to a suit,
having a direct interest in the action, or to a stranger to the
proceeding." *Turner* v. *Killian*, 12 Neb. 582. Or again
we may use the language of *Nixon* v. *Cupp*, 49 Pacific Rep.
930, a case which is identical in principle to the one which
is now before the Court ; the learned Judge saying, " While
it is sought to sever the liabilities of the securities from
that of the sheriff, there can be no contention and no rea-
sonable ground for separating the liability of one from that
of the other, because the bond is given for the ' faithful
performance and execution of the office of sheriff, and if
acting in the discharge of his duty, the sheriff fails to faith-
fully perform that duty, then the sureties are equally liable
with himself, and if, while acting *virtute officii*, a sheriff or
his deputy omits to do the thing which, in the faithful dis-
charge of his duty, he ought to have done, it is a misfeas-
ance, and a case of trespass, and the sheriff is liable on his
bond. *People* v. *Schuyler*, 4 N. Y. 179 ; *Mech. Pub. Off.*,
sec. 664, 667, 672, 682, 798 ; *South* v. *Maryland*, 18 How.
398 ; *Claney* v. *Kenworthy*, 74 Iowa, 740 ; *Hoffman* v.
*Koppelkom*, 8 Neb. 348.

*L. Allison Wilmer* and *Adrian Posey*, for the appellees.

The extraordinary principle is advanced in this case that
the sheriff's bond is responsible to the family of the crim-

inal committed under due process of law for accident or injury to the criminal. In other words, that the sheriff and his bondsmen are insurers of the criminal for the *benefit of his family*. The statement of the proposition is its best refutation. There is no case to be found in England or in this country where a sheriff and his bondsmen have been held responsible for the safe keeping of a prisoner committed to his charge by due process of law, except to the person who committed such prisoner to the sheriff. In the old *ca sa* cases the sheriff was held liable for escapes, and so when slaves were committed to the custody of the sheriff and, through negligence, they escaped. In such cases the persons committing had a property interest in the prisoners, and the sheriff and his bondsmen were held liable if through negligence they escaped. Where the prisoner is committed by the State the liability is to the State, and the officer is liable to punishment by indictment (18 Howard, page 402); if under civil process he is responsible to the person who caused the commitment, and no one else. The person to whom the sheriff is liable is the one to whom he owes a duty. The sheriff is not liable in a civil suit for a failure to keep the public peace whereby a person is injured. 22 *Amer. & Eng. Encyclopedia*, 555 ; *Watson on Sheriff*, 2, 3 ; *Pitcher* v. *King*, 2 Barnwell & Ald. 475 ; *Helary* v. *Breare & Holmes*, 1 Moody & Malkin, 52.

The only offence here committed by the sheriff was in failing to keep the peace whereby Cocking was killed, for which he was liable to indictment, and for which, as a matter of fact, he was indicted, but no civil action accrued to Cocking, had he survived, or to his children, now that he is dead. The sureties of the sheriff's bond are liable in the following cases only : For an escape, for failure to levy, to return process, to deliver goods to the defendant on discontinuance of action, for non-payment of money collected as sheriff, for loss of attachment by sheriff's negligence or voluntary act, for damages to property seized caused by his negligence, for overpayments exacted by him on process to

a third person, a stranger to the suit whose property he levies on, for omitting statutory requirements at a sale, for levying on exempt property. The sheriff himself may be held liable in many cases where his bond is not liable. The bond of a sheriff could not be held liable for an assault and battery committed by the sheriff upon a prisoner committed to his charge by regular legal process, although the sheriff himself would be. "Sureties of such an officer *cannot* be charged in an action *on his bond* for his violent or wrongful acts not done in the line of his official duty. (*Murfree*, 929). The obligation of the sureties is *strictissimi juris* and cannot be held responsible for any other than his official action. (*Same*, 942). By his official action is meant *the duty* the law imposes on him. The *bond* of the sheriff is not and cannot be responsible for the *crimes* of the sheriff. The courts punish the *sheriff* but not his bondsmen. (*Murfree,* 1173).

In the case of a criminal, the *safe keeping* of him is a duty he owes to the State, and on civil process, to the party who commits the criminal. In cases of heinous crime, indeed in any case of crime, others suffer besides the criminal. The creditor, the friend, the neighbor or the family of the accused, may suffer some *real* or fancied injury from the incarceration. But if anyone had the right to sue, no man, in his senses, would go on a sheriff's bond.

If the sheriff's negligence was the cause of Cocking's death, *he* is personally liable to the State, and there the liability ends. But suppose we are wrong in these views. Does the declaration disclose such negligence as would make the sheriff liable? The demurrer only admits such facts as are well pleaded. Now, the declaration states the facts that Cocking was duly indicted for murder by the grand jury and committed to the sheriff; that he was kept in the *county jail* under lock and key, and that he was taken out and hanged by a mob. Now, what was *the duty of the sheriff* in the premises? Remember, that the sheriff and his bond are only liable for *breach of duty* on the part

of the sheriff. It was no part of the *duty of the sheriff of Charles County* to remove his prisoner to Baltimore City jail, however earnestly the prisoner might have asked it. It is no part of the *duty of the sheriff to believe* all the reports he may have heard about lynching. It was *not the duty* of the sheriff to remove the prisoner to the new jail the moment the latter was finished.

PAGE, J., delivered the opinion of the Court.

This is a suit on the bond of George A. Wade, sheriff of Charles County, to recover damages for his alleged neglect in the performance of his duty, whereby the father of the equitable plaintiffs lost his life. After setting out the bond, it is alleged in the *narr.*, that Joseph Cocking, on the 21st May, 1896, was indicted by the grand jury of Charles County for the crime of murdering his wife, Fannie Cocking and her sister (though he was "innocent" of the same); that thereupon he was delivered to the custody of said sheriff, to safely keep until discharged in due course of law; that owing to intense excitement throughout Charles County, and to the great danger to the said prisoner from mob violence, the said Cocking had been "removed" to the jail in Baltimore City, but on the same day on which the indictment was found, the said sheriff again "removed" him to "an old dilapidated building, used as the jail of Charles County, at Port Tobacco (which said building was afterwards superseded as a jail of the said county by a strong new building in the town of La Plata, the said new jail being delivered, ready for use, to the said sheriff on or about the 15th day of June, 1896);" that on the 22nd May a change of venue was granted to St. Mary's County, and this caused increased excitement to prevail throughout Charles County; that the said sheriff had full knowledge thereof, yet he refused to remove the prisoner to the jail in Baltimore City, though he was requested repeatedly so to do by the said prisoner and his counsel, or to the new jail at La Plata; that not only did the said sheriff so refuse, but

also in spite of warnings by the prisoner and his counsel, the guards to the said building at Port Tobacco were removed " and the keys of the said building were placed in the custody and keeping of an aged and infirm negro who did not reside in the premises," and " the said building and the said prisoner were left wholly unprotected," and at the mercy of evilly disposed persons ; that on the 26th day of June, in the night-time, the jail was attacked by an unknown " body of men," and the said negro, upon the request of said men, " opened the doors of said building and delivered the said Cocking to the said unknown body of men," who took him from thence, and "in the most atrocious, brutal and unlawful manner " conveyed him to a point nearby, and there in the " presence of the said sheriff who had been warned by the negro, and who did not offer the slightest resistance to the said unknown body of men in their unlawful purpose, hanged the said prisoner by the neck until he was dead ; " so that the plaintiffs say " that by reason of said gross negligence of the said Sheriff· Wade, in the custody of said prisoner and his· failure in his duty to safely and properly keep said prisoner as aforesaid, the violent and premature death of said prisoner was occasioned as aforesaid, and that the equitable plaintiffs, children of said prisoner as aforesaid, have thereby been deprived of the support and maintenance of their father, the said prisoner."

The appellee demurred, the Court sustained the demurrer and the appellants appealed ; so that the sufficiency or not, of this *narr.*, is the only question before us.

It may be proper to observe that in a case like this, whatever right of action belongs to the children of the deceased Cocking, must be such only as they may have under the provisions of Article 67 of the Code ; and to entitle them to sue under that article, the death must be caused " by wrongful act, neglect or default," such as would have entitled the party injured to maintain an action and recover damages, if death had not ensued.   It follows from this that the matter first to be determined, is, whether Cocking himself (had not

his death ensued) would have had a right of action, under all the circumstances, to recover damages for the injuries he received at the hands of the mob.

There is no averment in the *narr.* that the sheriff has acted with malice, or with evil purpose towards the prisoner, or that he has personally assaulted, or otherwise maltreated him; but it is contended, with force and ability, that he should be held civilly liable, for the acts of the lawless mob, whereby the prisoner lost his life, because with knowledge of the existence of public excitement about the matter, he failed to remove the prisoner from the jail at Port Tobacco to the jail in Baltimore or the new building at La Plata, and having allowed him so to remain at Port Tobacco he removed the guards who had been stationed there to protect the prisoner, and committed the keys to an "old and infirm negro."

From a very early day the English law has contained provisions defining and regulating the rights and obligations of sheriffs in respect to the custody of persons charged with the commission of crime. As far back as the Statute of 14 Edward III, ch. 10, the right to the custody of the gaols was "rejoined" to the sheriffs of the bailiwicks; and by the 5 Hen. IV, it was ordained, that none be imprisoned by any justice of the peace, "but in the common gaol." In our own State, by statute passed in 1809, and now codified as section 16 of Article 42, no citizen committed to the custody of an officer for a criminal matter shall be removed from thence into the custody of another officer, unless by *habeas corpus* or other legal writ, except when the prisoner is delivered to a constable, or other inferior officer to be carried to some jail, or shall be removed from one place to another * * in order to his discharge or trial; or in case of sudden fire or infection, or other necessity, or," &c. Mr. Alexander in his valuable work on the "British Statutes," remarks of this section that it is "intended to prevent the vexation and danger of protracted imprisonment which might be occasioned by the removal of the prisoner from

one custody to another.    And it affirms therefore the principle that the prisoner ought to be committed to the proper prison in the first instance." This observation is supported by a fair interpretation of sections 43, 44 and 45 of Article 87 of the Code.    The first of these sections provides that the sheriff shall "Safely keep all persons committed to his custody by lawful authority until such persons are discharged by due course of law ;" and the place where he shall so " keep " them, is clearly indicated by the 45th section.    That section provides that all persons committed under the authority of the United States, the sheriff shall receive and safely keep in jail, " in the same manner and under like penalties as if such persons were committed under the authority of this State."    Now the jail at Port Tobacco was the common jail of the county ; though provisions had been made for another at La Plata, but this one was not in use, though it was finished about the fifteenth day of June.    The jail building at Port Tobacco was the place designated by the law for the detention of prisoners, and was the proper place for the detention of Cocking.    As a public jail it was under the supervision of the public authorities.    By section 22 of Article 51 of the Code, it was the duty of the grand jury to visit it, and inquire into its condition, the manner in which it was kept, and the treatment of the prisoners.    If it were that in any of these respects the sheriff had failed in his duty, he was liable to be proceeded against criminally. His duty to keep safe the prisoner was not for the benefit of the prisoner ; it was that he might be detained until discharged in due course of law, but the sheriff cannot under pretence of performing this duty, avail himself of the opportunities his position affords him, to indulge an evil spirit or wreak his malice on those over whom he has control.    He must keep his prisoners safe, so that they may be thence discharged in due course of law ; he must guard against the prisoner's own devices ; he must be prepared, as far as he reasonably can, to prevent evilly disposed persons on the outside from releasing them by force or in any wise against

law ; and if his jail be attacked, he must interpose such re-
sistance as he may be able to employ to defend his building,
so that he shall keep his prisoners.   How he shall accom-
plish this, may often be a matter of great difficulty and one
calling for the exercise of much judgment and high degree
of courage.   He will be required to take careful account of
all the circumstances that surround him, estimate in cases
of outside attack the forces he must encounter, and com-
pare them with his means of defence, and after due deliber-
ation determine what course is best for him to pursue.   If
he does this honestly, with a full purpose to perform his
whole duty, even though he make a mistake, whereby a
prisoner is injured, it would be monstrous to hold him civ-
illy responsible for damages to such prisoner.   "A public
officer is not liable to an action, if he falls into error in a
case where the act to be done is not merely a ministerial
one, but is one in relation to which it is his duty to exer-
cise judgment and discretion, even though an individual
may suffer by his mistake.   A contrary principle would
indeed be pregnant with the greatest mischief." *Kendall* v.
*Stokes*, 3 Howard 98 ; *Sherman and Redfield on Negligence*,
sec. 156, and authorities cited.   So also he must detain his
prisoner in the common jail, unless some necessity makes
it proper to remove him ; but it is his province to deter-
mine when such necessity has arrived ; and if in the honest
exercise of his discretion, he fails to remove him in time to
avert a prospective danger, he cannot be held civilly re-
sponsible.

    We are not concerned now with a case in which malic-
ious motives are imputed to the sheriff, as for instance like
that of *Asher* v. *Cabell*, 50 Fed. Rep. 818, where a United
States Marshal having taken a person into his custody and
shackled him, "Knowingly delivered him over to incom-
petent deputies and the known hostility of mobs.'" Such
conduct amounted to participation ; it imputed to the mar-
shal the wicked purpose of permitting, if not aiding, the
mob in its unlawful designs, and is wholly inconsistent with

the idea of an honest performance of duty. Here no dishonest or wicked purpose on the part of the sheriff is alleged, nor do the facts as set out in the declaration raise such an implication. If it could be shown that he placed the keys in the negro's hands with the purpose of facilitating the mob in the accomplishment of its purpose to seize and destroy Cocking, or if the facts alleged implied this, the two cases would be parallel. But Cocking was in the common jail where he ought to have been kept. If a necessity arose for his removal, the sheriff had power to so remove him, but it was within his province to determine when such necessity had arrived, and he cannot be made to answer civilly if he made an honest mistake.

But the case made by the *narr.* goes much farther than the mere safe-keeping of the prisoner. It raises the question how far a sheriff should he held liable for injuries resulting from his failure to preserve the peace from a mob. Stripped of verbiage, the substance of the *narr.* is that the sheriff is liable in damages for injuries to Cocking, resulting from his failure to preserve the public peace. It is not an escape, for which if it be a criminal matter, he must answer to the public: 1 *Blackstone Com.* 346, or if it be a civil case to the party injured, as in *Slemaker* v. *Marriott*, 5 G & J. 406 ; but a case where a "body of men," unknown and ill-disposed, in defiance of law and order, forced themselves into the jail, conveyed the prisoner from thence, and hung him until he was dead. The *narr.* alleges the sheriff was warned by the negro, and was present at the final scene, and offered no resistance, but there is no charge that such passivity was with malicious intent. Such an allegation, we think, was necessary ; for if with adequate means to resist the attack, he forebore to employ them, but quietly permitted the mob to have its will, no other conclusion would be possible than that he was a participant. As an officer having the jail in charge, and as a conservator of the peace wielding the executive power of the county for the preservation of the public peace, he cannot stand idly by

and allow the evil work to proceed at a time when he had at his command the physical means to stay it. But if his failure to do so was caused *bona fide* by the fact that he was physically unable to cope with the force confronting him, no responsibility would fall on him. The law applicable to sheriffs as conservators of the peace is so well stated in *South* v. *The State of Maryland*, 18 Howard, 396, that we will quote at length from the opinion delivered in that case. " It is," said GRIER, J., " an undisputed principle of the common law, that for a breach of a public duty an officer is punishable by indictment; but where he acts ministerially, and is bound to render certain services to individuals for a compensation in fees or salary, he is liable for acts of malfeasance or non-feasance to the party who is injured by them The powers and duties of conservator of the peace exercised by the sheriff are not strictly judicial; but he may be said to act as the chief magistrate of his county, wielding the executive power for the preservation of the public peace. It is a public duty, for neglect of which he is amenable to the public, and punishable by indictment only. The history of the law for centuries proves this to be the case. Actions against the sheriff for a breach of his ministerial duties in the execution of process are to be found in almost every book of reports. But no instance can be found where a civil action has been sustained against him for his default or misbehavior as conservator of the peace, by those who have suffered injury to their property or persons through the violence of mobs, riots or insurrections. In the case of *Entick* v. *Carrington*, State Trials, vol. 19, p. 1062, LORD CAMDEN remarks : ' No man ever heard of an action against a conservator of the peace as such.' The case of *Ashby* v. *White*, 2 Lord Raymond, 938, has been quoted to show that a sheriff may be liable to a civil action where he has acted in a judicial, rather than a ministerial capacity. This was an action brought by a citizen entitled to vote for member of Parliament, against the sheriff for refusing his vote at an election. GOULD, JUSTICE, thought the ac-

tion would not lie, because the sheriff acted as a judge; POWIS, because though not strictly a judge, he acted *quasi* judicially. But HOLT, C. J., decided the action would lie. 1st. Because the plaintiff had a right or privilege. 2nd. That by the act of the officer he was hindered from the enjoyment of it. 3rd. By the finding of the jury the act was done maliciously. The later cases all concur in the doctrine, that where the officer is held liable to a civil action for acts not simply ministerial, the plaintiff must allege and prove each of these propositions. See *Cullen* v. *Morris*, 2 Starkie, N. P. C. 577 ; *Harman* v. *Tappenden*, 1 East, 555," &c., &c.

For these reasons we are of opinion the *narr.* does not set out a sufficient cause of action.

We will add, that even if it had been charged in the *narr.* that the sheriff acted maliciously, the official bond of that officer could not be held liable in a case like this. The liability of the sureties is that of an express contract, that the sheriff shall " well and truly execute the office of sheriff and in all things thereto appertaining, and should well and truly perform all the duties required by law to be by him performed." This provision, it seems now to be well settled, " binds the officer affirmatively to the faithful execution of his office. There is no clause to cover an abuse or usurpation of power—no negative words that he will commit no wrong by color of his office, nor do anything not authorized by law." *State, use of Vanderworker* v. *Brown*, 54 Md. 325 ; 22 *Am. & Eng. Encyclopedia of Law*, pages 556 and 557.

For these reasons, it follows from what we have said the judgment must be affirmed.

*Judgment affirmed.*

(Decided April 1st, 1898).

BRYAN, J., delivered the following opinion :

I did not hear the argument in this case ; but having been present at the consultation, I approve in all respects of the able opinion which has been delivered. I wish to add a few words in addition to what has been so well said ; not, however, as implying that the opinion needs any support.

The deceased came to his death by lynching; and his children have, as equitable plaintiffs, brought an action on the sheriff's official bond to recover damages for his death. At the threshold of the case, we naturally inquire what is the legal foundation of their claim for damages, and under what circumstances can it be maintained. By the common law no civil action could be maintained for the killing of a freeman. A change was made in this respect by the Act of 1852, which is at present codified as Article 67 of the Code. It was enacted that if any one by his wrongful act, neglect or default should cause the death of another person, he should be liable to an action for damages; and that this action might be brought in the name of the State for the use of the wife, husband, parent and child of the deceased. A cause of action before unknown was granted to these relatives. It depends entirely on the statute, and it must be prosecuted in the manner therein prescribed and in no other way. It is an action of tort against the individual who did the wrong; and it cannot by any sort of legal transmutation be converted into an action *ex contractu.* It is for a death caused by tortious means; and it has no reference whatever to a contract, or a bond, or to any responsibilities arising from them. They do not contain any of the elements of the suit authorized by the statute; and it would be incompetent to set up any such cause of action under its terms. Suppose that the sheriff had executed and delivered to the deceased a bond with sureties, conditioned that he would not kill him; and he had afterwards slain him with his own hand. Who could have maintained a suit on such a bond? Most certainly it is not comprehended within the terms of the statute; and the common law would not give damages in any form of action for the killing. I do not think, therefore, that under any circumstances an action on the sheriff's official bond could be maintained for the death of the deceased.

(Filed April 12th, 1898.)