571 A.2d 859

Robert F. JONES et ux.

v.

**MARYLAND–NATIONAL CAPITAL PARK &
PLANNING COMMISSION et al.**

No. 1112, Sept. Term, 1989.

Court of Special Appeals of Maryland.

March 30, 1990.

Jay P. Holland (Steven M. Pavsner and Joseph, Greenwald & Laake, P.A., on the brief), Greenbelt, for appellants.

Joann Robertson, Sr. Asst. County Atty. (James J. Cagley, Asst. County Atty., on the brief), Rockville, for appellees.

Argued before BLOOM, WENNER, and CATHELL, JJ.

CATHELL, Judge.

Officer Barry Bratburd, of Maryland–National Capital Park & Planning Commission, while traveling between two facilities of that agency, was stopped at the intersection of Route 1 and Rhode Island Avenue in Prince George's County in the early hours of January 18, 1985. While there, he observed an automobile operated by Michael Carr stopped at a traffic light. The Carr vehicle, while at the traffic light, was rear-ended in an apparently minor collision by an automobile

driven by Mary Hope Pinkney. There was no damage evident to the Carr vehicle, and only minor damage to the Pinkney vehicle.

Officer Bratburd approached the accident scene. According to his deposition, the following then occurred:

Q You yourself had never, not ever had occasion to deal with a person suspected of being intoxicated?

A That is correct.

Q [W]hatever the exact interval between your question and her response, in seconds or mili-seconds, would it be fair to say, Officer Bratburd, that Mary Pinkney was rather slow to respond to your instructions?

A Yes.

Q Now, when she did respond, as I understand it, basically all she said was yes or sure or something like that, is that correct?

A Correct.

Q When she opened her mouth were you able to detect some alcohol?

A *I detected a slight odor* of what may have been an alcoholic beverage. Alcohol has no odor itself, it is the ingredients that give it its odor.

*     *     *     *     *     *

Q [I]mmediately following the time when you noticed this definite odor of what may have been an alcoholic beverage on Ms. Pinkney's breath, did you ask her to turn off her car?

A That was all done in the one speech while she was acknowledging what I was saying, that is when I noticed at the same time while I was talking. I didn't stop, notice, then start talking. It was all in our exchange. I just finished up by telling her to put the car in park and turn the ignition off. At that time I turned sideways. [emphasis added]

During his deposition, in response to questioning, Officer Bratburd described his official duties as follows:

A *To routinely patrol the parks and other buildings owned by the Park and Planning Commission and to respond to all calls for service relating to Park and Planning Commission property in those designated areas.*

    *          \*          \*          \*          \*          \*

It is my understanding that we have no police jurisdiction or powers in areas that aren't either owned or maintained by the Park and Planning Commission, where we have powers. We do have a Mutual Aid Agreement with the Prince George's County Police where we can act with authority for instances and incidents that we firsthand see involving criminal actions where if we do not take action it could cause grievously [sic] bodily injury or another criminal action to occur, things if we don't handle immediately the situation would get worse.

    \*          \*          \*          \*          \*          \*

Q Were you given any instruction with respect to what sort of action constituted an emergency within the meaning of your authority to exercise the police powers?

A *Like I said before, it was left up to the individual officer's interpretation. We weren't given any instruction as to what would be clearly defined as being an emergency situation. They left that up to our discretion.*

    \*          \*          \*          \*          \*          \*

Q [I]f you believed that she was under the influence of alcohol it would have been an emergency situation, would it not?

A Possibly.

Q Having seen her driving up the road with no headlights on and being involved in a motor vehicle accident, if you believed that she was then under the influence of alcohol it would have been an emergency situation, correct?

A Possibly.

Q  Under the Mutual Aid Agreement it would have been your obligation as well as your right to make an immediate investigation, correct?

A  Correct, in as much as the alcohol, I still don't think I had any authorization or jurisdiction to investigate the accident, as far as the collision.

Q  But at least as far as the fact that you—

A  I could have detained her physically for the responding jurisdiction, and be a witness.  [emphasis added]

Bratburd directed Pinkney to park the car and turn the ignition off.  Instead, as Bratburd turned away to call for the police agency in whose jurisdiction the accident had occurred, Pinkney sped away in a northbound direction on Route 1.  Bratburd attempted to follow her without using any emergency sirens or lights.  He lost her, but returned to the scene of the accident, where he met later with Trooper Crawford of the jurisdiction in question.  While Trooper Crawford was investigating the first accident, he received a radio transmission of another accident on Route 1.

Upon his arrival at the scene of the second accident, Crawford discovered that Pinkney, then going southbound, had crashed head-on into the vehicle of Robert F. Jones and Linda B. Jones, the appellants.  As a result of this accident, the Joneses filed suit against Pinkney, the Maryland–National Capital Park & Planning Commission and Officer Bratburd.  The trial court granted defendants Bratburd and Maryland–National Capital Park & Planning Commission's motion for judgment at the close of plaintiff's case.  We list and address the questions presented on appeal in the reverse order from which they were presented to us.

1.  Whether the trial court erred in ruling that Officer Bratburd was entitled to public official immunity?

2.  Whether the trial court erred in ruling that the defendant Maryland–National Capital Park & Planning Commission was not liable for the negligent acts of its servant, Officer Bratburd?

### 1.

Three basic elements are necessary to state a cause of action in negligence. First, the defendant must be under a duty to protect the plaintiff from injury. Second, the defendant must fail to discharge that duty. Third, the plaintiff must suffer actual loss or injury proximately resulting from that failure. *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985).

As we hold that appellee Bratburd was under no duty to protect the plaintiffs, we will not address the performance of any such duty, nor will we address the issue of whether any failure to discharge a duty owed was the proximate cause of appellants' loss or injuries. We explain.

*Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985), involved the issue of whether a probation officer who fails to report a probationer's violations owes a duty to an individual injured by the negligence of the probationer. The probationer in *Lamb* was convicted of driving while suspended, driving while intoxicated and other offenses while on probation. The probation agents did not petition the supervising court to incarcerate the probationer for the alleged violations. Subsequently, while driving under the influence, the probationer caused an accident which resulted in serious injuries to Mr. and Mrs. Lamb's minor daughter.

The Lambs filed suit, alleging negligence against the probationer, the Director of the Department of Parole and Probation and various employees of the Department. The trial court sustained a demurrer[1] to the complaint, without leave to amend, on the ground that the statute requiring probation officers to report to the court did not create a duty running to appellant.

The Court of Appeals in *Lamb* discussed the *Restatement (Second) of Torts* § 319 (1965). That section provides:

---

1. Since 1984 demurrers have not been a part of Maryland pleading. Maryland Rule 2–302.

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

*Lamb,* 303 Md. at 243, 492 A.2d 1297. In commenting upon the language used in the section, the Court noted that, "the operative words of this section, such as 'takes charge' and 'control,' are obviously vague, and the Restatement makes no formal attempt to define them." *Lamb,* 303 Md. at 243, 492 A.2d 1297. The Court went on to say that the comment to Section 319 indicates that the section applies in two situations:

First, § 319 applies to those situations where the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal. Second, § 319 applies to those situations where the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know.

*Lamb,* 303 Md. at 243, 492 A.2d 1297.

After giving certain examples, the Court stated: "Because there are degrees of being 'in charge' and having 'control,' these illustrations are obviously not by way of limitation. These illustrations suggest, however, that Section 319 has peculiar application to custodial situations." *Lamb,* 303 Md. at 244, 492 A.2d 1297 (citation omitted).

The Court stated, in discussing custody, that "The more traditional and obvious examples [of taking charge of a person] include a correctional institution incarcerating a dangerous criminal, or a mental institution confining a dangerous patient." *Lamb,* 303 Md. at 246, 492 A.2d 1297 (citations omitted). The Court then concluded that "because there was no custodial relationship involved in this case, ... the officers did not take charge of the probationer." *Id.* at 249, 492 A.2d 1297. The Court noted that "A minority of courts have challenged the proposition that an

actor can take charge of a third person only in a custodial situation." *Lamb*, 303 Md. at 249, 492 A.2d 1297.

The Joneses, in the case at hand, argue that the facts and opinions in several previous cases support an inference that Officer Bratburd owed them a duty in the present circumstance. As a result of this inference, they contend that the issue of whether Bratburd owed them any duty should have gone to the jury. Appellants further assert that, because *Lamb* mentioned the existence of a minority position challenging the necessity of a custodial situation as a prerequisite to "taking charge" of a third person, and because several subsequent Maryland cases failed to address that statement in *Lamb*,[2] the minority position alluded to in *Lamb* is the rule in Maryland.

Appellants cite *Ashburn v. Anne Arundel County*, 306 Md. 617, 510 A.2d 1078 (1986), which we will discuss at length later in our opinion. They proffer that the *Ashburn* Court, by citing a portion of *Jackson v. Clements*, 146 Cal.App.3d 983, 194 Cal.Rptr. 553 (1983), involving alteration of risk, implied that if the risk was altered a special relationship would exist.[3] *Jackson v. Clements* involved officers responding to a party where minors were allegedly drinking. They investigated the matter and temporarily detained one of the minors, who was later permitted to leave the party with two other minors who had also been drinking. An accident occurred, killing one of the minors as well as occupants of another car.

The trial court dismissed the action on demurrer. The plaintiffs had alleged that even though the officers *knew* that the minors were under the influence, knew they were too intoxicated to drive, and knew the minors intended to drive, the officers failed to take any action to prevent the minors from driving. The plaintiff in *Jackson* contended

---

**2.** In this manner, the Joneses continually rely on what they perceive to be omissions in Court of Appeals' decisions regarding issues raised in the case at bar.

**3.** Bratburd did not, in any event, alter any risk in the case at bar.

that once the officers undertook to investigate the party and made the observations, they had a duty to prevent the minors from driving.

Citing and quoting from a prior California case, the court in *Jackson* stated:

"[T]he question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity.... 'Absence of duty [rather than statutory immunity] is a particularly useful and conceptually more satisfactory rationale where, absent any "special relationship" between the officers and the plaintiff, the alleged tort consists merely in police nonfeasance.'"

*Jackson*, 194 Cal.Rptr. at 554. The California court also stated:

[P]laintiffs in both actions assert that there was a "special relationship" ... for the reasons that (1) the minors' conduct demonstrated that they were too intoxicated to drive and (2) the officers "exercised control" over [the driver] in that they detained him for about one-half hour during their investigation of the party.

Here, ... there is no allegation of an ongoing custodial relationship between the officers and the minor defendants. Plaintiffs cite no authority, nor has any been found, to support their claims that a police officer's observation of a citizen's conduct which might foreseeably create a risk of harm to others, or the officer's temporary detention of the citizen, creates a special relationship which imposes on the officer a duty to control the citizen's subsequent behavior. The case law is to the contrary.

*Jackson*, 194 Cal.Rptr. at 555 (citations omitted).

The portion of *Jackson* quoted in *Ashburn* and cited by the Joneses in their brief as support for the creation of a special relationship, related not to the injuries of the occupants of cars struck by the drunk driver, but to occupants

of the car being driven by the intoxicated driver. Even there the California court summarily rejected the plaintiff's claim of a special relationship. We note that in *Jackson,* the complaint, which was dismissed, alleged that the driver actually had been detained for one-half hour and that the officers *permitted* the driver and the passenger victim to drive away. The nonfeasance, if any, in *Jackson* was much more severe than any possible nonfeasance in the case at bar.[4] The holding in *Jackson* provides support for the trial court's action in this case and not for appellant's position.

*Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986), involved a police officer who observed one Mr. Millham in a pickup truck on a parking lot. Millham was intoxicated, and it was stipulated that he could have been charged with drunk driving.[5] Millham was ordered to pull to the side of the lot and to discontinue driving. The Court summarized the facts as follows:

> Apparently noticing Millham's condition, Officer Freeberger told Millham to pull his truck to the side of the lot and to discontinue driving that evening. As soon as Officer Freeberger left the scene, however, Millham drove the truck away from the lot, proceeded a short distance and collided with the appellant, John F. Ashburn, II, a pedestrian.... The circuit court ... held ... that Officer Freeberger and Anne Arundel County were immune from civil suit, and that Officer Freeberger owed no special duty to appellant.

*Ashburn,* 306 Md. at 620, 510 A.2d 1078.

On appeal, Ashburn argued that the officer was not immune because he negligently failed to detain a drunken driver, and that he had a mandatory duty to do so. In response the *Ashburn* Court stated:

---

4. We do not mean to imply that any nonfeasance existed in the instant case.

5. In the instant case no such stipulation exists, and it is only "possible" that upon the facts then known to Bratburd that Pinkney could have been so arrested.

Since *Cocking*,[6] the rule which we have applied to tort claims against a governmental representative is that the actor will be relieved of liability for his *non-malicious* acts where: (1) he "is a *public official* rather than a mere *governmental employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties."

*Ashburn,* 306 Md. at 622, 510 A.2d 1078 (emphasis in original, citations omitted). The Court went on to discuss, as dicta, that: "A proper plaintiff, however, is not without recourse. If he alleges sufficient facts to show that the defendant policeman created a 'special relationship' with him upon which he relied, he may maintain his action in negligence." *Ashburn,* 306 Md. at 630–31, 510 A.2d 1078 (citation omitted).

By way of a footnote, the Court noted that the *Restatement* provided for certain instances when a relationship between the officer and the actor might give rise to an action for negligence. One of the circumstances mentioned was when the actor was in the officer's custody. *Ashburn,* 306 Md. at 630, 510 A.2d 1078. Appellant, in the case sub judice, relies on the claim that the officer's direction to the wrongful driver amounted to a special relationship of custody. The Court of Appeals, in an *Ashburn* footnote, stated that the custodial relationship must be "ongoing," and mentioned the Washington case of *Bailey v. Town of Forks,* 38 Wash.App. 656, 688 P.2d 526, 531 (1984), for the proposition that a fleeting contact such as that in this case "fails to give rise to a 'special relationship.' "

Citing *Ashburn,* the Joneses further argue that, in determining duty, foreseeability is the key factor. The actual statement by the *Ashburn* Court was that, "[p]erhaps among these factors deemed most important is foreseeability." It then explained, however, that foreseeability does

---

6. *Cocking v. Wade,* 87 Md. 529, 40 A. 104 (1898).

not come into consideration until a "special relationship" exists:

> However, "foreseeability" must not be confused with "duty." The fact that a result may be foreseeable does not itself impose a duty in negligence terms. This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a "special relationship" exists either between the actor and the third person or between the actor and the person injured....
>
> Thus, we recognize the general rule, as do most courts, that absent a "special relationship" between police and victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers.

*Ashburn,* 306 Md. at 628, 510 A.2d 1078 (citations omitted).

As the Court of Appeals said in *Ashburn,* "[T]he 'duty' owed by the police by virtue of their positions as officers is a duty to protect the public, and the breach of that duty is most properly actionable by the public in the form of criminal prosecution or administrative disposition." *Id.* at 628, 510 A.2d 1078 (see citations therein).

The *Ashburn* Court pointed out the risks involved in attempting to hold police officers privately responsible for negligent performance of their public duties, when it stated:

> "[I]f the police were held to a duty enforceable by each individual member of the public, then every complaint— whether real, imagined, or frivolous would raise the specter of civil liability for failure to respond. Rather than exercise reasoned discretion and evaluate each particular allegation on its own merits the police may well be pressured to make hasty arrests solely to eliminate the threat of personal prosecution by the putative victim. Such a result historically has been viewed, and rightly so, as untenable, unworkable and unwise."

Furthermore, a policy which places a duty on a police officer to insure the safety of each member of the community would create an unnecessary burden on the judicial system. Under such circumstances, the slightest error of a policeman would give rise to a potential law suit.

Presently, the police officer is subject to disciplinary proceedings or criminal prosecution for any dereliction of duty, and these proceedings are better suited to review charges against the police officer for the breach of a duty which his job, rather than his responsibility as a member of the public, imposes upon him. Moreover, as stated by the District of Columbia Court of Appeals in *Morgan* [*v. District of Columbia*], *supra*, [468 A.2d 1306 (D.C. 1983)]

> "while public prosecution does little to console those who suffer from the mistakes of police officials, on balance, the community is better served by a policy that both protects the exercise of law enforcement discretion and affords a means of review by those who, in supervisory roles, are best able to evaluate the conduct of their charges."

*Ashburn*, 306 Md. at 629–30, 510 A.2d 1078 (citations omitted).

The *Ashburn* Court went on to explain that:

In order for a special relationship between police officer and victim to be found, it must be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection.

Appellant argues that the circumstances of this case imposed a special duty upon Officer Freeberger and Anne Arundel County to protect appellant. We disagree. Appellant has alleged no facts which show that Officer Freeberger affirmatively acted specifically for appellant's benefit or that Freeberger's actions induced appellant's reliance upon him. *Although it is true that Freeberger*

*affirmatively acted in approaching the driver and advising him to cease driving that evening, these actions on Freeberger's part created no special relationship with appellant.*

The majority of jurisdictions which have addressed the issue of special relationship under similar circumstances agree with us, that no special relationship exists between the officer and the person injured by the drunk driver.

*Ashburn,* 306 Md. at 631–32, 510 A.2d 1078 (citations omitted, emphasis added).

Appellants proffer that the law in Maryland is, or should be, that law espoused by the Massachusetts Supreme Court in *Irwin v. Town of Ware,* 392 Mass. 745, 467 N.E.2d 1292 (1984). That court defined the issue in that case as follows:

Is the decision of a police officer to remove from the roadways a driver who he knows or has reason to know is intoxicated a discretionary act .... We conclude it is not.

*Irwin,* 467 N.E.2d at 1298.

The Massachusetts court begs the question. It may be true that once it is determined that a driver is *legally* intoxicated, it is the public policy of the state for such a driver to be removed. The initial determination of whether a driver is intoxicated, however, is penultimately dependent upon the officer's exercise of his or her senses of hearing, eyesight, other sensory perceptions and upon the officer's total observation of the driving and other characteristics of the driver. Additionally, that determination is dependent upon the application of the officer's reasoning processes as they are influenced by his or her training and experience. In making this first level decision as to whether a driver is *legally* intoxicated, the officer may make use of field tests, portable breathalyzers, and the like. This first level decision is quintessentially discretionary in nature. Only if this initial process results in a decision that the driver is intoxicated or under the influence of alcohol *to the extent that it violates the law,* may the officer arrest the driver. Even that decision to arrest is a discretionary

function. Because Pinkney was not arrested, we need not decide whether, once a driver is arrested, the officer's activities become ministerial as opposed to discretionary. We note, however, that logic and strong considerations of public policy may well dictate that this function remain discretionary at least until such time as an *ongoing* custodial situation actually exists.

■ The Joneses also assert that Maryland Code (1977, 1987 Repl.Vol.), § 16–205.1 of the Transportation Article imposed a mandatory duty upon the officer to detain Pinkney. Thus they argue, he was performing a mandatory, not discretionary, duty. We first note that the statute applies, as we read it, only when a person is stopped on suspicion of "driving or attempting to drive while intoxicated, while under the influence of alcohol, or in violation of an alcohol restriction." Under the facts of the case at bar, it is crystal clear that Pinkney was not stopped by the officer, but was stopped by the accident. Officer Bratburd then directed her to the side of the road while he checked on the other driver and called for an officer who had authority to investigate the accident. Pinkney was required by statute to remain at the scene.[7] The officer had made no decision to apprehend, arrest or otherwise take Pinkney into custody. He was merely planning to stand by while an officer from the jurisdiction in question arrived to make those decisions. Even if § 16–205.1 of the Transportation Article created the type of mandatory duty urged upon us by appellants, neither of its predicates existed under the facts of this case. In any event, the Court of Appeals has held in *Ashburn*, that no private remedy under Section 16–205.1 exists.

---

7. Maryland Code (1977, 1987 Repl.Vol.), § 20–103(a) of the Transportation Article provides:

   *Stopping vehicle at scene of accident.*—The driver of each vehicle involved in an accident that results only in damage to an attended vehicle or other attended property immediately shall stop the vehicle as close as possible to the scene of the accident without obstructing traffic more than necessary.

As we read that statute in conjunction with §§ 10–302 to –309 of the Courts and Judicial Proceedings Article, we perceive them as primarily evidentiary statutes concerned with the production and admissibility of evidence and providing certain requirements that must be met in order for such evidence to be admissible. As we read the statutes, the use of the word "shall," relates to mandatory requirements for the admissibility of evidence, not to the creation of a ministerial duty on the part of the arresting officer. We believe that when the Court of Appeals, in *State v. Werkheiser*, 299 Md. 529, 474 A.2d 898 (1984), stated, that the use of the word "shall" made certain testing mandatory, it did so in the context of the admissibility of evidence. Our interpretation is further supported by the fact that the Court in *Werkheiser* reversed the trial court's order of dismissal, which order was based on the alleged failure of the officer in that case to perform the alleged mandatory duty of administering the test; the Court of Appeals holding, instead, that the appropriate remedy for such a failure to have the test performed was a prohibition against the admission of the evidence. We hold, as the Court of Appeals held in *Ashburn*, that § 16–205.1 of the Transportation Article creates no private remedy.

The factual situation in the case at bar is virtually identical to the facts in *Ashburn*. The *Ashburn* Court stated:

"[I]t does not appear that Officer Freeberger stopped or detained the drunk driver. Here, Officer Freeberger 'found' the drunk driver ... and 'told' the driver to *pull to the side ... and discontinue driving*.... Because Freeberger did not 'stop or detain' Millham, the requirements of § 16–205.1(b)(2) simply were not invoked."

*Ashburn*, 306 Md. at 626, 510 A.2d 1078 (emphasis added). That Court then stated:

Even if we were to assume that § 16–205.1 required Freeberger to stop or detain Millham, i.e., that the statute made Freeberger's actions ministerial, and thus nondiscretionary, appellant's cause would still fail because he did not establish that Freeberger owed him a duty in tort.

Judge McSherry stated for this Court over eighty years ago that:

> "there can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance, before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury.... As the duty varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact, if there has been no breach of duty."

*W.Va. Central R. Co. v. Fuller*, 96 Md. 652, 666, 54 A. 669, 671 (1903). Judge McSherry's comments remain viable today: negligence is a breach of a duty owed to one, and absent that duty, there can be no negligence. *Ashburn*, 306 Md. at 626–27, 510 A.2d 1078.

■ We do not believe that directing someone to do what that person had a duty to do, comply with a statute, while awaiting an investigation by another officer, under the circumstances of this case, is a "taking charge" of that person, or that it constitutes taking that person into custody. This is especially so where, under Jones' rationale, permitting an intoxicated person to drive on would create no such special relationship upon which a duty could be based. To hold otherwise would be to send a ludicrous message to the police officers of this state, *i.e.*, if you tell suspected drunks who have been involved in "fender benders" to drive off, you cannot be sued; but if you attempt to direct them to remain at the scene (when a statute requires them to do so or in order to investigate their sobriety) and they drive off anyway, you can be sued.

■ We believe that a detention or a taking of charge, for purposes of establishing a special duty, is determined by the existence of a continued custodial detention instead of an investigatory detention. In respect to accident situations, we distinguish between them as follows: Investigatory detention is that period where, subsequent to an accident, the officer is investigating or awaiting the outcome of an investigation; while an *ongoing* custodial detention would not, in most instances, occur until an actual custodial arrest has occurred and perhaps not even until an appropriate *judicial* officer has made a decision to hold the driver in custody, in lieu of bond, pending a trial on such charges. It is at the point of ongoing custodial detention, at the earliest, that an arresting officer's discretionary function *might* become ministerial; for, until such time, the officer may retain the absolute sole discretion to terminate the process without any continued detention.

■ We do not perceive the meaning of the decisions of the Court of Appeals in *Lamb* or *Ashburn* to be that a "special relationship" giving rise to liability to third parties could be created by a momentary, brief investigatory detention. Accordingly, we hold that no "special relationship" arises out of either an investigatory traffic stop or its resulting brief detention, such as that in the case at bar. Whether it arises out of an ongoing, continued, custodial detention which is subject to judicial oversight, would, perforce, depend upon the facts of a given case and upon subsequent pronunciations by the Court of Appeals.

Writing for this Court, Chief Judge Gilbert, in *Boyer v. State*, 80 Md.App. 101, 560 A.2d 48 (1989), discussed a case similar to the one at issue. The facts in *Boyer* indicated that an officer approached a car stopped at a red light and, suspecting the driver of driving while intoxicated, ordered him to pull off the road. The driver sped off instead. A high speed chase involving several officers of two jurisdictions ensued until the pursuit ended by the pursued vehicle crashing into the Boyer vehicle, killing the Boyers. The Boyers' children sued the police officers, the State, Charles

County and the driver of the fleeing car. Motions for summary judgment were granted in favor of all the defendants except the driver of the fleeing car that caused the crash. We said in *Boyer:*

> The public expects police officers to protect it from reckless and drunken drivers. Police are literally "the front line" in the national battle to rid the highway of those menaces. When performing the job of a law enforcement officer, the exercise of discretion may call for decisiveness and action in response to crises. A police officer's presently difficult job would be nearly impossible if every act committed in a non-malicious, discretionary manner could become the basis of a lawsuit. Were that to occur, we would in effect be placing handcuffs on the officers, not the culprits. We decline to restrict the officer's exercise of discretion.

*Boyer,* 80 Md.App. at 106, 560 A.2d 48 (citation omitted).

■ We hold that Bratburd owed no duty to appellants. Thus, his actions do not give rise to, nor do they support, an action in negligence against him. Additionally, we hold that as a public official performing a discretionary function, Bratburd was entitled to immunity from suit as a public officer.

### 2.

■ We said in *Boyer v. State:*

> Officer Titus, the State of Maryland, and Charles County are, in the final analysis, being sued because of Titus's decision to apprehend Farrar. Since Titus was acting in the capacity of a public official, without malice, in an exercise of discretion, he is immune from suit. The County and the State are also without liability because the alleged tortious conduct on which the suit against them is based results from actions of an individual who is personally immune.

*Boyer,* 80 Md.App. at 106, 560 A.2d 48 (citation omitted).

*Bradshaw v. Prince George's County,* 284 Md. 294, 396 A.2d 255 (1979), involved the issues of alleged tortious acts

by police officers', immunity, respondeat superior, etc. Prince George's County at that time had an immunity statute dealing with government liability that provided: "The county may be sued in actions sounding in tort in the same manner and to the same extent that any private person may be sued." *Bradshaw,* 284 Md. at 295, 396 A.2d 255. The facts in *Bradshaw* indicated that a police officer observed the body of a child hanging in a dumpster and upon examination believed the child to be dead and left the child there in order to preserve the scene of the crime. The child's mother arrived at the scene. The child was removed and a practical nurse attempted to resuscitate the child. There was conflicting evidence as to whether the child was momentarily resuscitated. The mother sued the officer for negligence and sued the county under the theory of respondeat superior.

Among other issues, the county asserted that it could not "be liable as a principal on the theory of respondeat superior for the tort of a non-liable agent." *Bradshaw,* 284 Md. at 297, 396 A.2d 255. The Court of Appeals in *Bradshaw* stated:

> In deciding whether there was actionable tortious conduct on the part of the police officers, we must address the doctrine of public official immunity as applied to the facts of this case. We have held that a police officer is a "public official" when acting within the scope of his law enforcement function. As a "public official," a police officer is protected by a qualified immunity against civil liability for non-malicious acts performed within the scope of his authority.

*Bradshaw,* 284 Md. at 302–03, 396 A.2d 255 (citations omitted). The *Bradshaw* Court then stated at 304, 396 A.2d 255:

> This analysis would seem to indicate that the state is, in effect, the principal of the police officers, and that the officer is protected from liability for his non-malicious tortious conduct by an extension of the state's sovereign immunity, and not by the umbrella of the county's gov-

ernmental immunity. In discussing the immunity of public officials, we have recognized that "[t]he immunity of such officers, where it exists, rests upon wholly different grounds from that of the State." ... The basis of "public official" immunity is that a public purpose is served by protecting officials when they act in an exercise of their discretion. Particularly in the case of law enforcement officers, the exercise of discretion may call for "decisiveness and precipitous action" in response to crises.

We conclude that the police officers' "public official" immunity rests upon different grounds from that of the County and the State, and that the County has not ... waived its public officials' immunity or agreed to assume responsibility for the non-malicious torts of its police officers. Thus, "public officials" of the County are still entitled to their immunity by reason of their status. Since police officers, as public officials, are not liable individually, the County cannot be held liable under the doctrine of *respondeat superior*. Our holding does not ignore the plain import of § 1013, as appellant suggests, because the County would remain liable for the negligent acts of those officers, agents, and employees who do not enjoy "public official" immunity.

*Bradshaw*, 284 Md. at 304–05, 396 A.2d 255 (citations omitted, footnotes omitted).

The proposition that appellants urged on this Court and on the trial court, in the case sub judice, has, in one form or another, been rejected in a consistent line of Maryland cases at least since the 1898 lynching case of *Cocking v. Wade*, 87 Md. 529, 541, 40 A. 104 (1898), where the Court of Appeals, quoting from an earlier case, stated:

"A public officer is not liable to an action ... where the act ... is one in relation to which it is his duty to exercise judgment and discretion, even though an individual may suffer by his mistake. A contrary principle would indeed be pregnant with the greatest mischief."

This rationale continued through the following cases, to name a few: *Bradshaw v. Prince George's County,* 284 Md. 294, 396 A.2d 255 (1979); *Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986); *Boyer v. State,* 80 Md.App. 101, 560 A.2d 48 (1989).[8] We again reiterate that principle. It is clear that Maryland police officers are public officials and that when they are within the scope of their law enforcement function they are *clearly* acting in a discretionary capacity.

This decision should leave no doubt that there is now a plethora of cases holding, that a police officer acting "without malice, in an exercise of discretion is immune from suit," *Boyer* at 106, 560 A.2d 48, and that the agency under whose authority the officer acts is likewise immune, because of the officer's immunity. This immunity is in no way circumscribed by describing clearly discretionary duties as if they were mandatory in nature. The nature of the function is self-determinative; it is not determined by the labels affixed thereto.

Having determined that there was no probative evidence supporting any possible legal concept of a "special relationship" between the officer and the actor or the victim, we need not further address whether Officer Bratburd's conduct was negligent. We hold that there was no legal duty owed to the plaintiff. Accordingly, there could be no actionable negligence for which the officer or his employer would be held liable. Additionally, Officer Bratburd was acting in a discretionary capacity and was thus immune from suit. The lack of actionable negligence in the first instance and the officer's public official's immunity rendered the other public defendant insusceptible to any imputation of negligence or to suit. Judge Briscoe was correct in granting the appellees' motion.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.

---

**8.** *See also* our comment in our recent case of *Sawyer v. Humphries,* 82 Md.App. 72, 86, 570 A.2d 341, 348 (1990).