**Robert E. McGLOCKLIN and Hazel P. McGlocklin, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. CV 92–299–N–LMB.

United States District Court,
D. Idaho.

March 24, 1994.

R. Max Etter, Jr., Spokane, WA, for plaintiffs.

Robert C. Grisham, Asst. U.S. Atty., Boise, ID, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM DECISION AND ORDER

BOYLE, United States Magistrate Judge.

### I.

### INTRODUCTION

This action seeking an award of monetary damages under negligence theories was brought by Plaintiffs Robert E. and Hazel P. McGlocklin, husband and wife (hereinafter "Plaintiffs" or "McGlocklins"), against the United States of America. In this action, brought pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, the McGlocklins alleged that United States customs officers were negligent in allowing Robert Adams, a Canadian fugitive, to pass through the customs port of entry station located at Eastport, Idaho, resulting in Adams travelling to their home, taking them hostage, and shooting Plaintiff Robert McGlocklin in the arm and back.

Trial commenced on March 1, 1994 and was heard by the Court sitting without a jury. Plaintiffs were represented by R. Max Etter, Jr. and Defendant was represented by Robert C. Grisham. At trial, the parties introduced oral and documentary evidence which has been carefully and thoroughly considered by the Court. Therefore, being fully advised in the premises, the Court enters the

following findings of fact, conclusions of law, order and judgment.

## II.

## FINDINGS OF FACT

Having carefully considered the testimony of all the witnesses called at trial, having thoroughly reviewed all of the exhibits admitted into evidence, and considered arguments and briefs of counsel, the Court makes the following Findings of Fact pursuant to Fed. R.Civ.P. 52(a).

### A. *Factual Background and Events*

1. The United States Customs Service operates a designated port of entry at Eastport, Idaho. The United States employs and has in place customs officers as well as officials from the United States Immigration and Naturalization Services at the Eastport, Idaho port of entry.

2. Customs service officers' training is similar in many respects to state and federal law enforcement officers in that they receive similar law enforcement training and instruction and carry a weapon for personal protection and protection of others around them. Customs service officers receive training and instruction regarding proper use, marksmanship, and other procedures relating to use of their weapons.

3. Customs service officers' duties and responsibilities, however, are different from state and federal law enforcement officers in many significant respects. Customs officers deal with tens of thousands of people each month, more than ninety percent of whom are ordinary, law-abiding citizens who are crossing the border for legitimate reasons, whereas local, state and federal law enforcement officers must have some reasonable basis to believe criminal activity has or is occurring before they can detain, question, or search people they encounter.

4. Customs officers are authorized with, and enjoy, almost plenary powers to question, detain and search individuals crossing the border, their vehicles, luggage and personal possessions. The primary focus of such customs station border searches is to discover merchandise or contraband which may be subject to taxation or confiscation. Personal safety considerations are also taken into account in situations where customs officers have some reasonable basis to fear for their safety or the safety of others.

5. The customs officers at the Eastport, Idaho port of entry have a two-step system, known as "primary" and "secondary" inspections. In the primary inspection, a customs officer in an outside booth performs a computerized license plate search of the license plate as a vehicle approaches to determine whether the vehicle has been reported stolen, and then in a personal dialogue with travelers, attempts to determine citizenship and residence of the vehicle occupants by asking a series of questions and, if necessary, requiring production of identification and vehicle registration forms.

6. If the customs officer conducting the primary inspection has a question regarding the individual's identity, or has other suspicions, the officer may instruct the individual to park his or her vehicle and enter the main building to undergo a "secondary" search. Such requests are made on a case-by-case basis.

7. If it appears that the occupant's vehicle has been reported stolen, or if the officer believes the occupant may be dangerous, the occupant is escorted to the main building for a secondary inspection.

8. The vast majority of travelers entering the United States through the Eastport, Idaho facility are not required to submit to a secondary inspection, although such secondary inspections are regularly conducted.

9. It is not uncommon for travelers attempting to enter the United States at the Eastport, Idaho port of entry to present incomplete or inaccurate identification during the secondary inspection. When that occurs, the traveler may be asked to empty his or her pockets in order that the customs officer can determine whether he or she is carrying any additional documentation which might resolve or clarify the question.

10. A traveler may also be asked during the secondary inspection to empty his or her

pockets if the customs officer suspects the traveler may be carrying contraband.

11. If there still remains some suspicion in the customer officer's mind after the traveler empties his or her pockets, a pat-down search may be performed to make sure the person has taken everything out of his or her pockets. If suspicion remains, a more thorough body search may be performed. If the customs officer has some information which leads to a reasonable belief that the traveler may be armed, a frisk search for weapons may also be performed.

12. A pat-down search is not performed every time a person presents inaccurate or incomplete identification at the Eastport, Idaho port of entry. Such a procedure would slow down the processing time to an unacceptable rate, would potentially infringe upon a traveler's right to be free from unlawful searches and create unwanted public relations problems for the customs service.

### B. *Canadian Fugitive Robert L. Adams Enters the United States*

13. On August 27, 1989, a person subsequently identified as Robert Lewis Adams (hereinafter "Adams"), a Canadian fugitive, attempted to cross the border from Canada into the United States through the Eastport, Idaho port of entry.

14. The customs and border port of entry officers at the Eastport, Idaho station had received no advance bulletin, notice or information from any Canadian or United States law enforcement agencies that a Canadian fugitive may attempt to cross the border, that he may be driving a stolen vehicle, or that he may be armed or dangerous.

15. Officer Susan Wilson, who conducted the primary inspection at the exterior booth, asked Adams his name, citizenship, destination, and requested that he produce identification. Adams stated that he was planning to drive to Nova Scotia, Canada through the United States because gasoline was cheaper in the United States. This is a common reason given by Canadian citizens for entering the United States.

16. Adams produced the written portion of an Alberta, Canada driver's license bearing the name of "Kenneth Matthew Mitchell." Upon inquiry by Officer Wilson, Adams stated he could not find the portion of the driver's license with the photograph. Officer Wilson knew that the Canadian driver's license was invalid without the photograph portion attached.

17. Because Adams could not produce the photograph portion of the driver's license, Officer Wilson directed him to park his car, go into the office and submit to further investigation. Officer Wilson also instructed Adams to bring the photo portion of his driver's license and any other forms of identification he had with him into the port of entry office.

18. The vehicle Adams was driving, a white Chevrolet Camaro, did not have a front license plate, so Officer Wilson did not have an opportunity to perform a computerized search, known as "TECS" search ("Treasury Department Computer System"), of the license plate number until Adams drove through the primary inspection lane and parked near the main port of entry office building.

19. The computerized TECS search performed by Wilson as Adams drove through the primary lane did not produce any information on the status of the car Adams was driving.

20. Adams was not required to be escorted into the main building after the initial conversation with Officer Wilson at the outside booth. Adams had an opportunity at that time to drive away, but instead drove his vehicle around the primary inspection lane and parked near the entrance of the port of entry building.

21. Officer Wilson's referral of Adams to the main office for a secondary inspection was a routine referral and, at that time, Adams was not a suspect or considered to be a violator.

22. While Adams was parking his vehicle, Officer Wilson entered the main building, gave Adams' driver's license to an officer inside, and briefly explained that Adams was coming in for a secondary inspection. Wilson then returned to the primary inspection lane, where she inspected and allowed two

vehicles which were waiting to pass through the border station.

23. In addition to Wilson, customs Officers Craig Sands and Johnnie Tesar and Port Director Joseph Hancock were on duty the evening of August 27, 1989.

24. When Adams arrived inside the customs office, he was questioned about his identity and told the officers that he could not locate the photo portion of his driver's license.

25. The date of birth on the driver's license was April 15, 1931 which would have made him fifty-eight years of age. At the time of these events, Adams was twenty-five years of age.

26. While inside the customs office, Adams stated that his date of birth was April 15, 1961. When asked about the discrepancy between his stated birth year and that on the driver's license, he stated that the birthdate on his license was a misprint.

27. Officer Sands went out to Adams' vehicle to retrieve the registration. The registration stated that the vehicle belonged to a "Gordon Paterson" of Calgary, Alberta, Canada.

28. The license plate on the rear of the vehicle was from Nova Scotia, Canada and was a different number than the Alberta license plate number printed on the vehicle registration.

29. The customs officers did not perform a TECS computer inquiry on the Alberta license plate number printed on the vehicle registration to determine whether the vehicle with that license plate number had been reported stolen.

30. When asked about the ownership of the car, Adams responded that it belonged to a friend.

31. While in the customs office, Adams was instructed to fill out a customs declaration form. After filling out and signing the form, the customs officers noticed that Adams had spelled his surname "M-i-t-c-h-i-l" but that name appeared as "M-i-t-c-h-e-l-l" on the driver's license he had given to Officer Wilson. Adams stated it was a misprint on the license.

32. It also appeared to the officer that the signatures on the driver's license and the customs declaration form were not in the same handwriting.

33. Officers Sands and Wilson observed that Adams appeared mildly nervous, but that it was common for people passing through the border to appear nervous. Officer Tesar testified that Adams did not appear noticeably nervous.

34. At this time, Officer Wilson returned to the customs building because there were no more vehicles waiting to pass through the border and was informed by the other officers of the discrepancies on the customs declaration form, driver's license birth year, and vehicle registration.

35. Officer Wilson took Adams' driver's license to Director Hancock, briefly explained the situation, and told him that "something was definitely wrong."

36. Officer Wilson's tone of voice did not indicate alarm, but she did not ordinarily say "something was definitely wrong" with respect to an individual attempting to cross the border.

37. Officer Hancock came out of his office, asked the officers to explain the situation to him, and then ordered that Adams' pockets be "dumped" to determine whether Adams had any other forms of identification on his person.

38. At this time, the customs officers suspected Adams was attempting to cross the border with false or stolen identification, but did not have reasonable basis to suspect him to be armed or potentially dangerous because people occasionally attempted to cross the border with false or stolen identification.

## C. *Adams Takes Hancock Hostage*

39. Officer Hancock walked around the main inspection counter and approached Adams from Adams' left rear side. Hancock intended to pat Adams' pockets to determine whether he had any other forms of identification, but did not intend to subject Adams to a "pat-down" or "frisk search" for weapons because he did not have any reasonable basis

at that time to believe Adams was armed or dangerous.

40. As Hancock approached Adams, Adams reached into his back trouser pocket. The officers who viewed this movement believed Adams was simply going to take his wallet out of his pocket.

41. As Adams reached into his pocket, he stated something to the effect of "I've had enough of this," and pulled out what appeared to be a functioning .45 caliber, Browning pistol.

42. Adams quickly worked the pistol action, grabbed Hancock around the neck, and moved around behind Hancock with his weapon pointed at Hancock's neck and head.

43. Although it was subsequently determined that the pistol Adams pulled out of his back trouser pocket was an inoperable replica pistol, the officers reasonably believed at the time of the foregoing events that the pistol was a loaded, functioning firearm.

44. Prior to the time Adams took Hancock hostage, no events had occurred to establish that the customs officers either knew, or should they have known, Adams was likely to cause bodily harm to them or others if he was not controlled.

45. This incident was the first time an individual had drawn a weapon at the Eastport, Idaho port of entry. It is unusual for Canadian citizens to have possession of firearms because of the strict gun control laws in effect in Canada, and the officers were understandably surprised to see Adams pull a pistol from his rear pocket.

46. After being taken hostage by Adams, Hancock did not attempt to draw his own weapon because he reasonably believed he would not survive the encounter. The other officers did not attempt to draw their weapons because they feared for Hancock's safety.

47. After Adams took Hancock hostage, Officers Sands and Wilson moved behind the TECS desk, which is protected by one-way, mirrored, bullet-proof glass. Officer Tesar moved behind the cash register located at the end of the main counter.

48. Adams ordered all the officers to surrender their weapons. None of the officers, except Wilson, complied. Wilson, who was standing behind the bullet-proof, mirrored glass, placed her weapon on the desk but when she realized Adams could not view her actions, she re-holstered her weapon.

49. Adams then proceeded to back out of the port of entry building's main doors, with Officer Hancock used as a shield in front of him.

50. Once outside the main doors of the port of entry building, and four to five feet away from his car, Adams forced Hancock to get down on the pavement and lay on his stomach.

51. Adams then took Hancock's weapon from his belt holster, got in his car, and sped away towards the United States border, leaving approximately thirty feet of black rubber acceleration marks.

52. Due to placement of the windows, doors and walls, the officers still inside the port of entry building could not see everything that was happening outside with Adams and Hancock. However, all the officers heard Adams' vehicle drive away when the engine roared and the tires squealed.

53. While Adams and Hancock were outside the port of entry building, Wilson placed an emergency "911" call to the Boundary County Sheriff's Office to report the encounter.

54. After Adams drove away, Hancock returned to the building and instructed Officers Tesar and Sands to take a customs service vehicle and attempt to pursue, but not to stop, the Adams vehicle because the customs vehicle did not have a two-way radio to report their position and neither Sands nor Tesar had received training in vehicular pursuit.

55. Officers Tesar and Sands attempted to follow the Adams vehicle but never again saw it after leaving the port of entry. The two officers drove south on the freeway for approximately fifteen miles and turned around when they observed the Boundary County Sheriff's vehicles driving north toward the border from Bonners Ferry, Idaho.

56. The customs officers inside the customs building had no reasonable opportunity

to shoot at Adams during the initial encounter.

57. The customs officers inside the building did not have a reasonable opportunity or sufficient time to attempt to shoot Adams when he took Hancock hostage.

58. Shooting at Adams through the plate glass windows of the customs building as he ran to his car, if a shot was even possible, would not have been prudent because the glass would likely deflect the bullets and render any shots ineffective.

59. When Adams got in his vehicle, Officer Hancock was still outside on his stomach and unarmed. The other officers reasonably feared for Hancock's safety if they had shot at Adams while Hancock was in the line of fire.

60. The officers did not attempt to shoot at the fleeing vehicle because they had been trained not to fire at moving vehicles.

61. Law enforcement training discourages firing at a moving vehicle because a handgun is usually ineffective at stopping a fleeing or moving vehicle and, if the driver is hit by a bullet, the vehicle could become an uncontrollable object which may endanger or harm other people.

### D. *Adams Takes Plaintiffs Hostage*

62. Upon leaving the port of entry at Eastport, Idaho, Adams drove approximately one mile south and turned onto the road leading to the McGlocklins' summer home and parked in front of the garage where their car was located.

63. When the McGlocklins heard their dog barking, Hazel McGlocklin opened the front door and noticed Adams had parked his car and was walking toward the house.

64. When Adams approached the porch, he asked Mrs. McGlocklin if he could use their telephone. Mrs. McGlocklin truthfully replied that their telephone had been disconnected because they were planning on driving to Nevada the next morning for the winter.

65. Adams then stated something to the effect "I'm sorry I've got to do this to you, lady," and drew the .357 magnum handgun he had taken from Hancock.

66. Plaintiff Robert McGlocklin came to the door to see what was happening. When he saw Adams with the pistol, he pulled his wife back and shut the door. Before Mr. McGlocklin could get the deadbolt lock set, Adams hit the door with the weight of his body, broke the frame, and attempted to enter the house.

67. When Hazel McGlocklin saw Adams break in the door, she retreated to the master bedroom and escaped through a sliding glass door that lead to a patio deck.

68. Hazel McGlocklin ran to her son's home, located approximately one-half mile down the road.

69. Robert McGlocklin held the door with his body as long as he could but Adams broke through into the living room. Upon entering the house, Adams asked where Mrs. McGlocklin had gone and Mr. McGlocklin responded that he did not know.

### E. *Adams and McGlocklin Shooting*

70. While Adams was searching the house for Hazel McGlocklin, Robert McGlocklin went into the bedroom and retrieved a loaded .22 caliber revolver.

71. Robert McGlocklin approached Adams in the hall with his .22 caliber pistol in hand. When Adams and McGlocklin were approximately four feet apart, McGlocklin shot Adams in the chest one time with the pistol. Almost simultaneously, Adams shot McGlocklin in his right arm with Officer Hancock's .357 magnum. The bullet entered McGlocklin's arm and lodged in his shoulder.

72. After being shot, McGlocklin immediately retreated to the bathroom. Adams reached his gun hand into the bathroom and shot blindly into the bathroom. The shot missed McGlocklin and hit the bathroom wall.

73. Adams reached his arm around the door frame further to get closer to McGlocklin's position and shot again. This shot grazed McGlocklin across the fleshy part of his back but did not strike any major soft tissue or bone.

74. McGlocklin changed his pistol from his right to his left hand and shot around the door frame towards the hall in an attempt to scare off Adams. After that shot was fired by McGlocklin, Adams quickly left the residence and ran off towards the river.

75. Remaining in the home, McGlocklin positioned himself so he could observe Adams' movements and to see where Adams went.

76. Hazel McGlocklin heard the series of shots and, believing Adams was the only armed individual in the house, feared that her husband had been shot and was probably dead.

77. Mrs. McGlocklin arrived at her son's home and although her son was not home, she found a hidden key, entered the home, and called the police.

78. In response to Mrs. McGlocklin's call, Bonner County Sheriff officers arrived at the scene, called for medical assistance, located Adams collapsed in tall grass near the river and placed him under arrest.

79. After receiving primary medical care and attention, both Adams and McGlocklin were air-lifted by separate emergency life flight helicopters later that same evening to Sacred Heart Hospital in Spokane, Washington for further medical treatment.

80. The helicopter carrying Adams crashed, killing Adams and all medical and flight personnel aboard.

81. Robert McGlocklin subsequently underwent tendon transplant surgery in Las Vegas, Nevada and received approximately three months of daily physical therapy.

82. As a result of the gunshot wound to his right arm, Robert McGlocklin has suffered permanent physical injury which impairs his ability to hold on to and grip objects with his right hand and to fully use his right arm. As a result of his residual injury, Robert McGlocklin cannot play golf, perform ordinary home repairs, fly fish, bowl, or engage in any other activities which require him to securely hold objects with his right hand.

83. The McGlocklins have also suffered emotional injury as a result of Adams' attack, although such injury has not been diagnosed or treated by a medical professional.

84. Mr. McGlocklin is not currently taking any medication related directly to his injuries and does not currently suffer significant pain or discomfort as a result of his gunshot wounds.

### III.

### CONCLUSIONS OF LAW

85. To the extent any findings of fact are deemed to be conclusions of law, they are incorporated by reference into these conclusions of law.

86. This action was brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*

87. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1346(b).

88. As required by the Federal Tort Claims Act, this Court must determine whether the United States is subject to tort liability by applying the law of the state "where the act or omission occurred." 28 U.S.C. § 1346(b); *Wright v. United States,* 719 F.2d 1032, 1034 (9th Cir.1983).

89. The alleged acts or omissions in this action occurred in the state of Idaho.

90. The actions of the customs officers in this action are most closely analogous to those of state law enforcement officers, rather than private citizens. However, certain important differences as to duties and responsibilities exist between customs officers and state law enforcement officers, which the Court has taken into account in rendering its decision herein. *See Doggett v. United States,* 875 F.2d 684, 689 (9th Cir.1989).

91. Under applicable and governing Idaho tort law applicable to this instant action, Plaintiffs must prove the following elements by a preponderance of the evidence: (1) a duty recognized by law requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4)

actual loss or damage. *Alegria v. Payonk*, 101 Idaho 617, 619, 619 P.2d 135 (1980).

■ 92. The general rule under Idaho law is that a person has no duty to prevent a third party from causing physical injury to another. *Olguin v. City of Burley*, 119 Idaho 721, 810 P.2d 255 (1991);[1] *Lundgren v. City of McCall*, 120 Idaho 556, 817 P.2d 1080 (1991).

93. The foregoing Idaho general rules of law apply in situations where state law enforcement officers are sued under negligence theories for failing to protect innocent bystanders or third parties from criminals. *Olguin v. City of Burley, supra; Lundgren v. City of McCall, supra.*

94. A recognized exception to this rule arises where a "special relationship" exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct or where a "special relationship" exists between the actor and the other which gives to the other a right of protection. *Sterling v. Bloom*, 111 Idaho 211, 224–25, 723 P.2d 755 (1986); Restatement (Second) of Torts §§ 319(a), (b). This special relationship can arise where a person takes charge of an individual having dangerous propensities:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Restatement (Second) of Torts § 319; *Sterling v. Bloom*, 111 Idaho at 225, 723 P.2d 755.

■ 95. The customs officers in this action did not "take charge" of Adams during the secondary inspection within the meaning of *Sterling v. Bloom, supra,* and the Restatement (Second) of Torts § 319, either before or after Adams drew his weapon and took Hancock hostage. Although Adams was re-quired to submit to a secondary inspection, there was no established, custodial-like relationship existing between the customs officers and Adams as contemplated by Idaho law and Section 319 of the Restatement. *Sterling v. Bloom, supra; Olguin v. City of Burley, supra; Lundgren v. City of McCall, supra; see also Jones v. Maryland–National Capital Park and Planning Comm'n*, 82 Md. App. 314, 571 A.2d 859 (1990), *cert. denied,* 320 Md. 351, 578 A.2d 191 (1990).

96. Prior to the time Adams pulled out his weapon inside the port of entry building and took Hancock hostage, the Court concludes as a matter of law that the customs officers neither knew, nor should they have known, Adams was likely to cause bodily harm to them or others if not physically controlled by them.

97. Further, the Court concludes that there was no "special relationship" created or existing between the customs officers and Adams so as to give rise to a duty of care of the customs officers to Plaintiffs within the meaning of Restatement (Second) of Torts § 319 and Idaho case law. *Sterling v. Bloom, supra; Olguin v. City of Burley, supra; Lundgren v. City of McCall, supra.*

98. As a matter of law, at no time did the customs officers owe Plaintiffs a duty to control Adams so as to prevent him from harming Plaintiffs.

99. The customs service policy directives do not create a duty owed to Plaintiffs in this instant action. *Attallah v. United States*, 955 F.2d 776, 785 n. 15 (1st Cir.1992); *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988); *Zabala Clemente v. United States*, 567 F.2d 1140 (1st Cir.), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).

100. While the customs policy directives regarding personal searches empowered and authorized customs officers to conduct a patdown or frisk search of Adams for weapons,

---

1. In *Ransom v. Garden City,* 113 Idaho 202, 743 P.2d 70 (1987), the Supreme Court of Idaho held that a negligence action against police officers could be brought where the officers negligently entrusted the keys to a vehicle to a passenger of the vehicle, knowing that both the driver and the passenger were too intoxicated to drive. After the officers gave the passenger the keys to the car, the passenger drove away and injured plaintiff. The Court finds that while both *Ransom* and *Olguin* are virtually indistinguishable, they appear to reach opposite results. Therefore, to the extent these decisions may conflict, the Court will rely on the more current authority as stated in *Olguin v. City of Burley, supra,* and *Lundgren v. City of McCall, supra.*

these policy directives did not require the customs officers in this action to conduct an immediate or eventual pat-down or a frisk search of Adams during the course of the secondary inspection.

101. The existing customs policy directives regarding personal searches did not create a duty of care owed by customs officers to Plaintiffs. *Zabala Clemente v. United States,* 567 F.2d at 1144.

102. The customs officers in this action did not have a duty under the laws of Idaho, federal law or the Constitution of the United States to attempt to control Adams so as to prevent him from harming Plaintiffs. *De-Shaney v. Winnebago County Dept. of Social Svcs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696 (9th Cir.1988).

103. Plaintiffs' evidence failed to show, demonstrate or prove by a preponderance of the evidence that the customs service officers in this action owed Plaintiffs a duty of care.

104. In order that the Court's conclusions of law and decision in this respect be clear, and assuming that the evidence proved the customs officers in this action owed Plaintiffs a duty to exercise reasonable care to control Adams to prevent him from incurring bodily harm, Plaintiffs' evidence failed to establish by a preponderance of the evidence that the customs officers breached any duty of care owed to them. Restatement (Second) of Torts § 319; *Sterling v. Bloom, supra.*

105. The customs officers were not negligent in their actions and dealings with Adams during the time he was at the Eastport, Idaho port of entry.

106. The customs officers exercised reasonable care at all times and under all existing circumstances.

107. It was reasonable for the officers not to conduct a pat-down or frisk search of Adams for weapons because they did not have a reasonable basis to suspect that he may be armed or dangerous.

108. The port of entry customs officers exercised reasonable care under the circumstances by not attempting to apprehend, shoot or disable Adams after he took Hancock hostage while he was escaping or while he was driving away in the speeding Camaro.

109. Assuming the customs officers owed Plaintiffs a duty of care, and that any duty was breached, Plaintiffs' evidence failed to establish by a preponderance of the evidence that the customs officers' actions, conduct or omissions were the proximate cause of their injuries and damages.

110. It would be speculation and conjecture on the part of the Court to conclude that a decision to pat-search Adams for weapons or to attempt to apprehend, shoot or disable Adams after he took Hancock hostage or was escaping would have altered the course of events which led to Plaintiffs' injuries and damages.

## IV.

111. As a personal observation and comment, the Court was genuinely impressed by the courage demonstrated by Mr. and Mrs. McGlocklin in this life threatening and truly frightening episode. Likewise, the Court is personally sympathetic to both Mr. and Mrs. McGlocklin for the serious mental and physical injuries sustained as a result of Adams' actions. It is clear and obvious to the Court that everyone involved in this incident, particularly the McGlocklins and Officer Hancock, as well as the medical personnel and flight crew that were killed in the helicopter crash, were also victims of Adams' actions. However, notwithstanding the Court's personal sympathy and concern for all of these people, particularly the McGlocklins, who were not voluntarily involved in any of these events as either customs station or emergency flight crew employees, the fact remains that the Court must properly apply the law to these unusual and unique events. Having done so, the Court concludes that the McGlocklins, although having suffered both injury and damage, do not have a legal remedy available or a right to an award of damages against Defendant United States for the events that are the subject of this action. Accordingly, judgment should be entered in favor of Defendant.

## V.

### ORDER

Based on the foregoing and good cause appearing therefor,

IT IS HEREBY ORDERED that judgment be entered in favor of Defendant United States of America and that Plaintiffs take nothing by their complaint which is dismissed on the merits.

SO ORDERED.