**CORRECTIONS**

SHERIFFS – LOCAL JAILS – WHETHER KENT COUNTY MAY CLOSE ITS COUNTY JAIL – WHETHER THE COUNTY MAY RELY ON A PER DIEM CONTRACT WITH ANOTHER COUNTY TO HOUSE INCARCERATED INDIVIDUALS

December 23, 2025

*The Honorable Dennis W. Hickman, Jr.*
*Sheriff, Kent County*

You have asked whether Kent County (the "County") may close its only jail and rely entirely on contracts with neighboring counties to house incarcerated individuals at a per diem rate. For the reasons that follow, we conclude that State law prohibits this course of action. The Correctional Services Article makes one official in each county—by default, the Sheriff—responsible for the safekeeping of people committed to local custody. Although the statutes governing that safekeeping responsibility do not say so explicitly, they imply that the official must carry out the responsibility by holding these people in a jail of the county. Each county, for its part, has a statutory obligation to fund its jailer and must therefore pay for this facility. A county may satisfy this obligation by joining with one or more other counties to establish a multi-jurisdictional jail for which they share responsibility. But unlike the legislatures of some other states, the General Assembly has not authorized Kent County or any other county to dispense with its own facilities by paying for jail services elsewhere, in facilities that it does not help to manage or oversee. In fact, if a county were to close its jail entirely, judges in that county would have no facility to which they could sentence a person to a term of imprisonment of one year or less.[1]

# I
# Background

A "jail," as we use the term here, is a local government facility capable of housing pretrial detainees as well as people convicted of crimes who are serving short sentences. Black's Law Dictionary (12th ed. 2024); *see, e.g.*, 93 *Opinions of the Attorney General* 92,

---

[1] The analysis of county responsibilities in this opinion does not apply to Baltimore City. In that jurisdiction, unlike in the counties, State law provides for the State to operate the jail facilities. Md. Code Ann., Corr. Servs. §§ 1-101(q)(2), 11-101; *see* 93 *Opinions of the Attorney General* 92, 93 n.1 (2008).

93 (2008) (using "jail" in this sense); 62 *Opinions of the Attorney General* 829, 833 (1977) (same). A jail is a type of "local correctional facility," which is a broader term used throughout the Correctional Services Article that also encompasses "lockups" and other types of holding rooms suitable only for brief confinement pending a hearing or transfer. *See* Md. Code Ann., Corr. Servs. ("CS") § 1-101(d), (*l*) & Rev. Note; 99 *Opinions of the Attorney General* 3, 8-9 (2014).

Every county in Maryland currently has a jail. *See* Governor's Office of Crime Prevention and Policy, *Local Detention Center Population Statistics* [hereinafter "*Jail Population Statistics*"] (showing pretrial and sentenced jail populations in every county going back to 2014).[2] This has long been the case, as far as we can tell. In 1674, the colonial General Assembly required every county to build a "prison" within the ensuing two years to allay the "great dishonor" that the lack of such facilities had caused the Government. 1674 Md. Laws, ch. 16.[3] At that time, county facilities were mainly necessary to house pretrial detainees, as convicted offenders were not traditionally incarcerated. *See* Maryland Manual, *Department of Public Safety & Correctional Services: Origin*, https://msa.maryland.gov/msa/ mdmanual/22dpscs/html/dpscsf.html (last visited Dec. 16, 2025). Thereafter, even when a county lacked an adequate jail for some reason, it appears that the situation was not permitted to endure long. In early State laws, the General Assembly often intervened to provide for the construction or replacement of county jails if existing facilities did not meet local needs. *E.g.*, 1794 Md. Laws, ch. 67 (providing for the reconstruction of the Talbot County jail, which was in a "ruinous condition" and "incapable of repair"); 1792 Md. Laws, ch. 39 (similar for Kent County); 1793 Md. Laws, ch. 17 (mandating the construction of a courthouse and jail in Allegany County following its founding in 1789); 1780 Md. Laws, ch. 37 (providing for a new "gaol" in Dorchester County).[4] Later,

---

[2] Available at https://app.powerbigov.us/view?r=eyJrIjoiMzJlNmRh ZmEtMWI1MC00NDYzLWE5NjUtYTU2NTk4MWU3ZTRiIiwidCI6 IjYwYWZlOWUyLTQ5Y2QtNDliMS04ODUxLTY0ZGYwMjc2YTJl OCJ9 (last visited Dec. 16, 2025).

[3] *See* Maryland Manual, *Department of Public Safety & Correctional Services: Origin*, https://msa.maryland.gov/msa/mdmanual/22dpscs/ html/dpscsf.html (last visited Dec. 15, 2025).

[4] Other sources show that new counties prioritized the construction of jails. Mary Ann Ashcraft, *Carroll Yesteryears: Carroll County's Beginnings Included a Jail, Free Schools*, Carroll County Times (Dec.

when the Worcester County jail burned down, the General Assembly set up a fund for the construction of a new facility, which it considered "imperative." 1894 Md. Laws, ch. 250.

Kent County has one jail, the Kent County Detention Center (the "Detention Center"), which you currently oversee as Sheriff. The facility typically houses approximately fifty detainees.[5] *See Jail Population Statistics* (click on "Kent"). Roughly two-thirds of them are pretrial detainees, and the others are serving short sentences. *Id.* You tell us that the facility is old and short-staffed. It is also expensive for the County to operate. Like many counties, Kent County spends much of its public safety budget on the Detention Center. *See* County Commissioners of Kent County, *Annual Comprehensive Financial Report for FY2024* at 69;[6] Littman, *supra* note 4, at 884 ("[J]ails' annual operating budgets . . . make up a significant portion of routine local government spending" in the United States.).

The County Commissioners hope to reduce the County's correctional expenses. To that end, the Commissioners recently began exploring the idea of establishing a joint correctional facility with neighboring Queen Anne's County, which has a detainee population of a similar size. *See Jail Population Statistics* (click on "Queen Anne's"). Counties have explicit statutory authority to establish such joint facilities, CS § 11-102, which fall under the definition of "local correctional facility," CS § 1-101(*l*)(1). But this idea will take time to pursue.

In the interim, the County has decided to pay neighboring counties to house some of its detainees. This arrangement apparently costs less than housing detainees at the Detention Center. In July 2025, you and the County Commissioners executed

---

7, 2019) (discussing a historical source showing that the Carroll County Commissioners immediately took up the business of building a jail upon the County's founding in 1837 and that they designated a "temporary place of incarceration" for the Sheriff's use in the meantime); *see generally* Aaron Littman, *Jails, Sheriffs, and Carceral Policymaking*, 74 Vand. L. Rev. 861, 931 & n.315 (2021) (discussing the Carroll County Times article and other sources showing that "jails were among the first public buildings erected in newly formed counties" in the United States).

[5] The statutory term for people confined in State or local custody is "incarcerated individual." CS § 1-101(k). For brevity, we use the term "detainee" in this opinion for people held in local jails.

[6] Available at https://cms2.revize.com/revize/kentcountymd/Documents/Finance/ACFR%202024.pdf.

an agreement with the Queen Anne's County Detention Center, under which the County will pay Queen Anne's County $125 per day per detainee housed. The County has transferred twelve detainees to the Queen Anne's County Detention Center under this agreement to date, according to your letter. The County is also pursuing, but has not yet finalized, a similar per diem rate agreement with Talbot County.

Your question concerns a related proposal by one of the County Commissioners that would go further. Under the proposal, as you explain it, the County would shut down the Detention Center's boarding function and rely entirely on per diem contracts with neighboring counties to house pretrial detainees and sentenced offenders. The Detention Center would thereafter function only as a temporary holding facility or lockup, capable of detaining people for just a few hours during booking.

You ask whether this proposal would comply with State law. In particular, you point out that § 9-105(2) of the Correctional Services Article authorizes a judge to sentence an individual to a "local correctional facility" only if "the judge imposing the sentence is in a jurisdiction that is a party to the operation and maintenance of the local correctional facility to which the individual is sentenced." You ask whether this statute would allow a judge in Kent County to sentence a person to a jail in a neighboring county with which Kent County has contracted for jail services at a per diem rate.

## II
## Analysis

To determine whether Kent County could effectively close the Detention Center and pay another county to house its detainees in the other county's jail, we must first address a threshold question: whether Maryland law requires Kent County to have a jail in the first place or, at least, to be a "party to the operation and maintenance" of a jail. Because, as we will explain, we conclude that Maryland law does impose that requirement, the second (and primary) issue is whether a county may establish a shared jail—or, put differently, whether a county may become a "party to the operation and maintenance" of a jail—merely by paying another county to house detainees in the other county's jail. For reasons that we explain below in Part II.B, we do not think so: Although the contours of Maryland's shared jail program are opaque and largely unexplored, we think the program requires a participating

county to go beyond the purchase of jail services and to take a stake in the jail facility itself.

At the outset, we note that these issues require us to interpret the State's corrections and sentencing statutes to ascertain the Legislature's intent in enacting them. For that task, we rely primarily on the statutory language, read in proper context, and also consider, among other factors, the underlying purpose of the legislation and its history. *See Williams v. State*, 492 Md. 295, 306-08 (2025). "In every case, [a] statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Mayor and City Council of Baltimore v. Wallace*, 492 Md. 349, 368 (2025) (quoting *Lockshin v. Semsker*, 412 Md. 257, 276 (2010)). Under these principles, even where a statutory scheme does not impose a requirement explicitly, the context, history, and purpose of the statutes in question—and the need to avoid illogical consequences—may nonetheless favor interpreting the statutes to impose a requirement implicitly. *See, e.g.*, *Cassidy v. Board of Educ.*, 316 Md. 50, 52 n.2 (1989) (recognizing an implicit statutory requirement); 100 *Opinions of the Attorney General* 85, 99 (2015) (concluding that "the only reasonable way to read the statute" in question was that it imposed an "implicit[]" requirement); 64 *Opinions of the Attorney General* 341, 344 (1979) (concluding that a statute "necessarily implies a requirement" applicable to a local legislative body); *see also Bethesda African Cemetery Coal. v. Housing Opportunities Comm'n*, 489 Md. 1, 62 (2024) (explaining that courts may interpret permissive statutory language as mandatory due to "context-specific" considerations).

## A. The County's Obligation to Establish a Jail

We first consider whether Maryland law requires each county to have its own jail or at least to establish a shared jail with one or more other counties.

To begin, no statute explicitly requires each Maryland county to have a jail. The laws of some other states do.[7] Conversely, the

---

[7] *E.g.*, Texas Code Ann., Local Gov't § 351.001(a) ("The commissioners court of a county shall provide safe and suitable jails for the county."); N.Y. County Law § 217 ("Each county shall continue to maintain a county jail as prescribed by law."); W. Va. Code § 7-3-2 ("The county commission of every county, at the expense of the county, shall provide at the county seat thereof a suitable courthouse and jail . . . ."); *see also Curtis v. Lincoln County*, 136 Minn. 25, 27 (1917) ("The

statutes of some states, in accommodating situations where a county lacks a jail, make plain that a county need not have one.[8] But the Maryland Code does not contain statutes of either type.

Although two Maryland statutes *authorize* counties to establish "local correctional facilities," the statutory term that encompasses jails, that also does not resolve the question. CS § 11-102(a) (providing that any county may establish such a facility); Md. Code Ann., Local Gov't § 10-304(c) (providing that charter and code counties may "establish and maintain local correctional or detention facilities" and "regulate all individuals confined in the facilities"); *see generally* 85 *Opinions of the Attorney General* 338, 344 (2000). We do not think that these authorizations for a county to establish a jail or a shared jail may be read in their own right to mandate that a county establish one such facility, because they use the term "may," which is ordinarily read not to impose a mandate. *See Uthus v. Valley Mill Camp, Inc.*, 472 Md. 378, 395 (2021) (describing the "Court's long history of interpreting the statutory term 'may' as discretionary, as opposed to the mandatory term 'shall'").

In a similar vein, some public local laws impose an explicit duty on particular counties to pay the expenses of the county jail. *See* Somerset County Code of Public Local Laws § 12-102 (2003) ("The County Commissioners shall furnish all food, fuel, and light needed for the County Detention Center . . . ."); Washington County Code of Public Local Laws § 3-201 (2019) (requiring the County to provide funds "for keeping each prisoner in the county jail" and "for necessary fuel for the jail"). But even if these county-specific enactments of the General Assembly could be interpreted to prohibit the counties in question from eliminating their own facilities, we have not identified a measure of this sort for Kent

---

statutes make it the duty of the county board to provide a courthouse and jail . . . ."); *Wehn v. Gage County Comm'rs*, 5 Neb. 494, 497 (1877) ("By an act of the legislature . . . it is made the duty of the board of county commissioners of each organized county in the state, to erect a suitable jail . . . .").

[8] *See* Cal. Penal Code § 4007 ("When there is no jail in the county . . . the superior court may . . . designate the jail of a contiguous county for the confinement of any prisoner . . . ."); 57 Okla. Stat. Ann. § 41 ("Every county . . . shall have a jail *or access to a jail in another county* for the safekeeping of prisoners . . . ." (emphasis added)); *Commonwealth v. Carroll County Fiscal Court*, 633 S.W.2d 720, 721 (Ky. Ct. App. 1982) (reading similar statutes to mean that a county may make arrangements for prisoners instead of having a jail); 1991 Fla. Op. Att'y Gen. No. 91-25, 1991 WL 528160, at *2 (Apr. 18, 1991) (similar).

County (which, as a code home rule county, may amend public local laws enacted for it by the General Assembly in any event). *See Waterman Family Ltd. P'ship v. Boomer*, 456 Md. 330, 345-46 (2017). In short, then, no State law explicitly requires every county, or Kent County in particular, to have a jail.

However, for reasons that we will explain below, we conclude that Maryland law does implicitly impose such a mandate on all counties, including Kent County. That mandate arises, in our opinion, from the sections of the Correctional Services Article that govern the safekeeping of local detainees. *See* CS §§ 11-201, 11-203. A county may satisfy this mandate either by establishing its own jail or by joining with other counties to establish a joint facility. *See* CS § 11-103(b). Although the safekeeping statutes do not impose this mandate expressly, we think that they must be interpreted to do so when read in conjunction with the rest of the statutory scheme, especially the sentencing statutes you reference that allow a judge to sentence a person to a local facility only if it belongs at least in part to the county where the case originated. *See* CS §§ 9-104, 9-105, 9-302. In fact, the State's sentencing and corrections systems are built upon the existence of such a mandate, and the requirement for a county to establish a jail facility is thus implied in numerous provisions of the Maryland Code.

### 1. The Safekeeping Statutes

At common law, the local sheriff served as county jailer—that is, as the official obligated to "keep safely the inmates entrusted to the sheriff's custody." 93 *Opinions of the Attorney General* at 95; *see also* 58 *Opinions of the Attorney General* 647, 647-48 (1973) (similar). In this role, the sheriffs were required to hold anyone whom the courts committed to their custody, including pretrial detainees, *Harford County v. UMMS*, 318 Md. 525, 528 (1990), and "felons and other criminals," 58 *Opinions of the Attorney General* at 647.

The General Assembly has largely codified the sheriffs' common law duty to serve as jailer in the safekeeping statutes, which appear at §§ 11-201 and 11-203 of the Correctional Services Article. *See, e.g.*, *Harford County*, 318 Md. at 528-29. These statutes, which date to the nineteenth century, *see State v. Wade*, 40 A. 104, 105 (Md. 1898), provide that the Sheriff in a county must "keep safely" those detainees committed to his custody, CS § 11-201(a), and supply them with "food and board" and, with some limitations, medical care, CS § 11-203(a)(1). The county, in turn, must "pay the costs associated" with the Sheriff's

performance of these duties. CS § 11-203(a)(2). This specific county obligation to fund the Sheriff's operations as jailer tracks the more general obligation of each county to pay the Sheriff's expenses. *See* Md. Code Ann., Courts & Jud. Proc. § 2-313(c); *Harford County*, 318 Md. at 528.

The safekeeping statutes do not themselves identify which categories of detainees may be committed to local custody. *See* CS § 11-201(a). But other aspects of State law authorize courts to commit both pretrial detainees and convicted offenders sentenced to 18 months or less to local custody. *See Epps v. Levine*, 457 F. Supp. 561, 565 (D. Md. 1978) (reviewing laws, including what is now CS § 9-611(a), authorizing the commitment of an accused to local custody pending trial); CS § 9-105 (authorizing sentences of up to 18 months to be served in local correctional facilities). Aside from the county jailers, no other custodian has a general obligation to take custody of pretrial detainees or offenders serving short sentences. *See Harford County*, 318 Md. at 530 (discussing pretrial detainees); CS §§ 9-104, 9-105 (generally authorizing commitment only to local custody—and not to State custody—where the sentence is 18 months or less). Under the resulting practice, then, the Statewide corrections system relies on county jailers to hold both populations. Department of Legis. Servs., *Maryland's Criminal and Juvenile Justice Process* 55, 153 (2022).

The safekeeping statutes modify the common law by allowing most counties, including Kent County, to shift the role of jailer to a different official other than the Sheriff. CS § 11-201(b)-(e). For example, a county might establish a local department of corrections, run by an appointed official rather than the Sheriff. *See* 79 *Opinions of the Attorney General* 83, 84-85 (1994). Or if two or more counties join together to establish a shared local correctional facility, the managing official of the shared facility takes responsibility for the detainees confined there. CS §§ 11-102(b)(1), 11-103.

A county that uses one of these mechanisms to displace the Sheriff, however, still has financial responsibility for the food, board, and care of its detainees. *See* CS § 11-203(a). In Kent County, it is our understanding that the Sheriff currently bears the safekeeping responsibilities of the jailer, although until recently the County Commissioners had assigned these duties to County correctional officers. County Commissioners of Kent County, Resolution 2025-02 (Mar. 4, 2025).

Although the safekeeping statutes do not expressly forbid a county and its jailer from satisfying their obligations toward detainees by arranging for them to be housed in a facility that the county and its jailer do not operate, some elements of the text imply that a county must establish a jail (either by itself or with other counties) to satisfy these obligations. The statutes refer to the county jailer—whether the Sheriff or another official—as "the managing official of *a local correctional facility*." CS § 11-203(a)(1) (emphasis added). This suggests that the official must have a local correctional facility to manage and that the official's provision of "food and board" to detainees should occur in that facility. *See id*.; *see also* CS § 11-201(b)(1) (authorizing charter counties to appoint "a qualified individual as managing official of *the local correctional facility*" (emphasis added)). Similarly, the safekeeping statutes require the Sheriff or other jailer to hold federal detainees—who may be committed to local custody in exchange for payment—"in a local correctional facility" and "in the same manner" as detainees committed under State law. CS § 11-201(a)(2). Again, the implication is that the jailer must have a facility capable of housing people serving sentences.

To be clear, we do not think that these textual clues in the safekeeping statutes establish by themselves that a county must have a jail or a shared jail. That conclusion becomes evident only when the statutes are read in conjunction with the rest of the statutory scheme, especially the State sentencing laws discussed below. *See infra* Part II.A.2. However, the Maryland courts have attributed these aspects of the safekeeping statutes substantial weight when discussing the place of a detainee's confinement. In an 1898 case, the Supreme Court of Maryland declared that the statutory language about holding federal detainees in local facilities "clearly indicated" that the Sheriff must keep all persons committed to his custody "in jail." *Wade*, 40 A. at 105. Specifically, the Sheriff "must detain his prisoner *in the common jail*, unless some necessity makes it proper to remove [the prisoner]." *Id*. at 106 (emphasis added); *see also Baumgarten v. State*, 21 Md. App. 251, 259-60 (1974) (relying on *Wade* to uphold a jury instruction providing that "[i]t has long been established that the place where persons shall be kept [by the Sheriff] is in jail"). This obligation, the Court noted, aligned with a pre-revolutionary English statute that was received into State law and that prohibited a justice of the peace from holding a detainee anywhere "but in the common gaol." *Id*. at 260 (quoting 5 Hen. IV); *see* Kilty's English Statutes 225 (1811) (listing this English statute among those "found

applicable and proper to be incorporated" into State law);[9] *Beckwitt v. State*, 477 Md. 398, 425-26 (2022) (describing Kilty as the "preeminent authority" on the incorporation of pre-revolutionary English statutes into Maryland law).

It is true that, under *Wade* and later authorities, a county jailer has authority to hold detainees elsewhere when exigent circumstances require—such as when an emergency renders the jail unsafe, 93 *Opinions of the Attorney General* at 92, or when a detainee needs medical care, *Harford County*, 318 Md. at 530; *see also* CS § 8-115(a), (c)(1) (authorizing State inspectors to close a correctional facility and transfer detainees to another "suitable place of detention" upon finding a "life threatening or health endangering" condition in the facility). And the General Assembly has more recently authorized counties to provide for detainees to be held in jails shared by one or more counties. CS §§ 11-102(b)(1), 11-103; *see infra* Part II.A.2 (discussing the history of these statutes).

Generally, however, precedent suggests that the Sheriff or other "designated custodian" must hold county detainees in the county jail. *Harford County*, 318 Md. at 529-30; *Wade*, 40 A. at 106. This longstanding interpretation of the safekeeping statutes necessarily implies that the Sheriff or other jailer must have a jail facility and that the county must fund that facility.

This reading also comports with historical practice. Although fires, disrepair, or other circumstances have sometimes left counties without a jail, we have found no discussion in the legal authorities of a scenario in which a Maryland county sought to eliminate its only jail or otherwise sought to govern without a jail. *See supra* Part I; 105 *Opinions of the Attorney General* 3, 17 (2020) (relying on historical context as an indicator of legislative intent).

### 2. *Sentencing Statutes*

Perhaps more importantly, the General Assembly has long woven this understanding of the safekeeping statutes into State sentencing law.

Traditionally, Maryland criminal statutes often specified whether a person convicted of a particular offense should serve their sentence in State or local custody. *See Bowers v. State*, 227

---

[9] Available at https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000143/html/index.html.

Md. App. 310, 326-27 (2016) (mentioning nineteenth century statutes and a 2002 Revisor's Note reflecting these traditional "distinctions between imprisonment in a State or local correctional facility"). When addressing local custody, the statutes sometimes provided that the sentence should be served "in jail," Md. Ann. Code, Art. 27, § 306 (1951), and sometimes provided more specifically that the sentence should be "to the Jail of the County" where the crime occurred, *id*. § 407. Similar language appeared in a more general statute governing removed cases, that is, cases transferred to another county to ensure a fair and impartial trial. This removal statute provided—as current Maryland law still does—that if an offender was to be sentenced to local rather than State custody, the sentence should be to "the jail *of the county or city from which such removal took place*." Md. Ann. Code, Art. 27, § 724 (1951) (emphasis added); *see* CS § 9-302(a) (current statute providing that such offenders must be sentenced "*to a local correctional facility of the county* from which the case was removed" (emphasis added)).[10] Together, these laws required a sentence to local custody to be served in the jail of the county where the crime was committed (or the jail of the county where the case originated) and thus reflected the General Assembly's expectation that each county was to have a jail. *See Smith v. State*, 116 Md. App. 43, 61 (1997) ("The common law venue for any crime is the county where the crime is committed, the *locus criminis*. In Maryland, the common law of venue controls unless modified by statute." (internal citations omitted)).

The General Assembly has since adapted this sentencing framework to conform to two more recent corrections policies, but these changes further reinforce our conclusion. First, in 1968, it authorized counties to satisfy their safekeeping obligations by establishing shared jails, which were then called "regional detention facilities." 1968 Md. Laws, ch. 481 (enacting Art. 27,

---

[10] The reference to city jails in the old version of the statute evidently referred to Baltimore City: The statute also referred to the "sheriff of the county or city," and, as the Revisor later noted, no other Maryland city has a sheriff. 1999 Md. Laws, ch. 54 (Revisor's Note to CS § 9-302). Upon recodification in 1999, the Revisor defined "county" to include Baltimore City and deleted the word "city" from the section "for accuracy." *Id*. Other cities in Maryland do not have any financial obligation to provide for detainees. *See* CS § 11-203(a)(2) (imposing this obligation on counties). The Correctional Services Article contemplates in places that municipalities may run "local correctional facilities*," see* CS §§ 1-101(*l*)(2), 11-102.1, but this has apparently been understood to allow their police departments to establish holding areas as opposed to jails. *See* 93 *Opinions of the Attorney General* at 93 n.1.

§ 705). That legislation authorized a judge to sentence an offender to a regional facility so long as the judge's county was "a party to the operation and maintenance" of the facility. *Id*. The authorization contained a "notwithstanding clause" that overrode the criminal statutes that sometimes required a sentence to be served in the jail of the county where the crime was committed. *See id*.; 68 *Opinions of the Attorney General* at 195, 202 (1983). After the 1968 legislation, then, the sentencing laws allowed judges to sentence offenders to a shared county facility as an exception to the general rule of sentencing people to a jail in the county where the crime occurred. Under this framework, a county had to have either a shared jail or its own jail.

Second, in 1986, the General Assembly, at the Governor's urging, enacted an overarching rule to assign convicted offenders to State or local custody based on sentence length. *See* 1986 Md. Laws, ch. 128; *see also* 93 *Opinions of the Attorney General* at 94; Summary of Senate Jud. Proc. Comm. Report on H.B. 474, 1986 Leg., Reg. Sess., at 1 (noting that the legislation was sponsored by the House Speaker, on behalf of the Administration). Under this rule, a commitment to State custody generally requires a sentence longer than a year, whereas a commitment to local custody requires a sentence of 18 months or less. CS §§ 9-104, 9-105. Before this legislation, in contrast, the minimum sentence for confinement in State custody was three months. *See* Summary of Senate Jud. Proc. Comm. Report on H.B. 474, 1986 Leg., Reg. Sess., at 3. No sentencing cap applied to standard county jails. Fiscal Note, H.B. 474, 1986 Leg., Reg. Sess. at 1. The only cap on sentences to local custody was an 18-month limit that applied exclusively to regional facilities, apparently as a benefit to induce counties to establish them. *See* 68 *Opinions of the Attorney General* at 202.

The General Assembly enacted the new State-local framework in 1986 because it decided that short- and long-term detainees had different needs and required separate quarters. *See Hearing on H.B. 474 Before the House Judiciary Comm.*, 1986 Leg., Reg. Sess., at 1 (written testimony of Wayne McDaniel, of the Governor's Office, noting that the legislation would "better segregate long-term and short-term offenders" and would be "highly beneficial to both inmates and the correctional system"); Summary of Senate Jud. Proc. Comm. Report on H.B. 474, 1986 Leg., Reg. Sess., at 3 (indicating that the purpose of the legislation was "to provide better care for both short term and long term prisoners"). The General Assembly opted to rely on county facilities to hold the short-term population, although it also provided for some financial assistance from the State to defray the

counties' costs. *Hearing on H.B. 474 Before the House Judiciary Comm.*, 1986 Leg., Reg. Sess., at 1 (written testimony of Wayne McDaniel, of the Governor's Office, that "[i]n recognition of this increased burden, [the legislation] establishe[d] an operating assistance program for the local governments"); Fiscal Note on H.B. 474, 1986 Leg., Reg. Sess. at 1 (describing the reimbursement structure); *see also* CS § 9-402(b) (providing for State reimbursement of some local correctional facility costs for housing people serving sentences between 12 and 18 months), CS §§ 11-104, 11-105 (authorizing State financial assistance for the construction, maintenance, or enlargement of local correctional facilities).

To conform to the 1986 legislation's overarching rule for place of custody by sentence length, the code revision process has mostly eliminated the distinctions in specific criminal laws between State and local custody. 2002 Md. Laws, ch. 26 (Revisor's Note to Crim. Law § 2-207). As a result, the criminal laws no longer state explicitly that a sentence to local custody must be served in the jail of a particular county. *See, e.g.*, *id*. (Revisor's Note to Crim. Law § 8-405 discussing the elimination of language requiring imprisonment "in the jail of the county or city in which [a] conviction is had").[11]

But the sentencing framework in current law nonetheless makes plain that, where an offender is to be sentenced to local custody, the judge may only commit the offender to a jail of the county where the crime took place or a shared jail that that county has established with others. The statute for removed cases continues to provide that a sentence to local custody "shall be to a local correctional facility of the county from which the case was removed." CS § 9-302. Similarly, in a standard case that has not been removed, the judge may impose a sentence of 18 months or less to a local correctional facility only if the county where the judge sits is "a party to the operation and maintenance" of the facility. CS § 9-105(2).

The latter requirement for the county to be "a party to the operation and maintenance" of the facility means, in our view, that

---

[11] At least one criminal law does, however, continue to distinguish between sentences to State or local custody. Md. Code Ann., Crim. Law § 2-207(a)(2) ("A person who commits manslaughter is guilty of a felony and on conviction is subject to . . . imprisonment in a local correctional facility not exceeding 2 years . . . ."); *see Bowers*, 227 Md. App. at 327 n.9 (noting a potential conflict between this statute and CS § 9-105, which caps sentences to local facilities at 18 months).

a judge may sentence an offender to a jail that does not belong exclusively to the judge's county—or, in a removed case, to the original county for the case—only if that jail is a shared facility that the County has established under CS § 11-102(b). Admittedly, the text of the statute no longer says this as clearly as it once did. When the General Assembly decided in 1986 to extend the 18-month cap on local sentences to apply to all jails (rather than to shared jails only), it did so by replacing the term "regional detention center" with "local detention center" everywhere it appeared in the Code, including in what is now § 9-105. 1986 Md. Laws, ch. 128.[12] As a result, the text of the "party to the operation and maintenance" requirement does not, in its current form, expressly address a judge's authority to impose a sentence to a shared jail within the meaning of CS § 11-102(b). But we have no doubt that the requirement continues to carry this meaning. The General Assembly enacted it as part of its program for shared jails and amended it only for unrelated reasons. *See* 1968 Md. Laws, ch. 481; 1986 Md. Laws, ch. 128. The language of the requirement also continues to track the authorization of shared jails contained in CS § 11-102(b) (allowing counties to allocate "responsibility, construction, operation, maintenance, and appointment of personnel" for such a facility). A county is thus a "party to the operation and maintenance" of a jail that is not its own only if the jail is a shared facility established by the county and others under CS § 11-102(b).

In conclusion, we think that the State's sentencing laws and their history make apparent that a county's obligation to provide for detainees includes the obligation to have a jail of its own or a jail that it shares with one or more other counties. If a county did not have a jail meeting these requirements, then the sentencing statutes would leave judges in that county, or judges imposing sentences in cases removed from that county, with no facility to which to sentence an offender to a short term of confinement. We do not think that the General Assembly intended to put sentencing judges in such a bind. *See Wallace*, 492 Md. at 368 ("Our task is to interpret statutes, whenever possible, to *avoid* absurd results . . . .").[13]

---

[12] Code revision subsequently changed the latter term to "local correctional facility." *See* CS § 1-101 (Rev. Note, 1999 Md. Laws, ch. 54).

[13] With regard to pretrial confinement, the State Code does not contain equivalent statutes that explicitly provide that a detainee must be held in a jail of the county where the charges arise. *See Epps*, 457 F. Supp. at

### 3.    Other Statutes

Beyond the sentencing statutes, other statutes similarly indicate that the General Assembly expects all counties to have jails.   For each individual county, the General Assembly has enacted laws creating work-release programs and other corrections programs for that county.  CS tit. 11, subtit. 7 (containing a section for every county but Somerset); Somerset County Code of Public Local Laws, tit. 6 (2003) (governing "prison work" in Somerset County).  Invariably, these county-specific measures refer to the confinement of detainees in the local jail facilities.  *E.g.*, CS § 11-702(c)(4) (providing generally that, in Allegany County, "an incarcerated individual shall be confined in the detention center when not participating in the work release program").  Many of the provisions, including the one for Kent County, refer to the county jail by name.  *E.g.*, CS § 11-716(c) ("Kent County Detention Center"); CS § 11-715(d)(2) ("Howard County Detention Center"); CS § 11-719(b) ("Queen Anne's County Jail"); CS § 11-722(b) ("Talbot County Jail").  The underlying premise is that each county has a jail.

Statutes governing funding for the expansion of county jails and the duties of county grand juries operate on the same premise— that each county has or is party to a local correctional facility.  *See* CS § 11-105(a) (authorizing State funding for the expansion of a county jail if "the anticipated confinement of incarcerated individuals" serving sentences between 6 and 12 months "in a county's local correctional facility would exceed the capacity of the local correctional facility"); CS § 9-608 ("At least once each year, the grand jury in each county shall . . . visit each local correctional facility in the county . . . .").

We acknowledge that other statutes, mentioned earlier, merely authorize the counties to establish jails without imposing

---

565-66.   It is at least possible that the common law imposes this requirement, although we find it unnecessary to resolve this issue given the clarity with which the sentencing statutes imply that each county must have at least a shared jail.  *Compare Harford County*, 318 Md. at 528 ("[T]he sheriff was the custodian of all persons arrested and charged with a criminal offense pending their trial . . . .   This common law duty is retained by the sheriff unless expressly removed or modified by the Legislature."), *with Epps*, 457 F. Supp. at 565-66 & n.2 (acknowledging that under "Maryland common law, traditionally custody of an accused was given to the county sheriff" but holding nonetheless that State law does "not mandate that a pretrial detainee necessarily be in custody of the local sheriff or jail warden").

any mandate in this regard. *See* CS § 11-102(a); Local Gov't § 10-304(c); *supra* Part II.A. One might argue that interpreting the safekeeping statutes to require each county to have a jail, as we do, renders these authorization statutes superfluous and conflicts with the Legislature's decision not to include a mandate in them. *See, e.g.*, *Stanley v. State*, 390 Md. 175, 183-84 (2005) ("It is a well settled canon of statutory construction that we should . . . give effect to all of the language and avoid a construction that renders any portion superfluous.").

But we are not persuaded by this line of reasoning. Like all statutes, permissive authorization statutes exist in broader context. *See, e.g.*, *Bethesda African Cemetery Coal.*, 489 Md. at 61-62 ("We discern legislative intent not by considering text in isolation, but instead by viewing it within the context of the statutory scheme to which it belongs." (internal quotation marks omitted)). Even where such a statute does not impose a mandate, other sources of law may do so separately. *See id.* at 15-16 (reasoning that even where a permissive statute did not impose restrictions on the owners of burial grounds, the common law nonetheless did so); *id.* at 78 ("The statute says nothing about the various possible rights and protections that can be enforced through the common law.").

Under our interpretation of the safekeeping statutes, the authorization statutes still serve an important purpose: They grant the counties control over how the jail requirement—which entails significant expense for them—is satisfied. *See* 85 *Opinions of the Attorney General* at 344 (citing CS §§ 11-102(a) and the predecessor to Local Gov't § 10-304(c) for the proposition that "a county detention center is a county facility, regardless of whether the local sheriff is responsible for its operation"). As a result, in counties where the Sheriff (who is a State official) remains the jailer, the counties may nonetheless drive the process of establishing a jail. *Id.* at 344-45. We have explained how this dynamic works before: It is "prudent" for the county to consult the Sheriff when making decisions about a jail facility, but the authorization statutes establish "beyond dispute" that the county has ultimate authority over the development of the facility. *Id.*

Finally, we acknowledge again that no statute explicitly requires a county or its jailer to have a jail or a shared jail. This lack of an explicit requirement, however, does not resolve the matter under Maryland principles of statutory interpretation. *See supra* Part II (explaining that other indicators of legislative intent, including context and the need to avoid absurd results, may require

recognition of an implicit mandate). In this case, as we have explained, the only reasonable interpretation of the relevant corrections and sentencing statutes is that a county must have a jail or a shared jail, notwithstanding the absence of any explicit statutory language to that effect.

All of these considerations lead us to conclude that State law imposes a duty on each county to provide a jail capable of confining pretrial detainees and sentenced offenders or, at least, to be a party to a shared jail as authorized by CS § 11-102. A county may not provide for its detainees by relying exclusively on other arrangements for their confinement. That course of action would violate the safekeeping statutes and leave State judges with no place to commit many offenders to short sentences.

## B. *Per Diem Contracts*

The second question that we must address is whether Kent County may satisfy its obligation to establish at least a shared jail by purchasing bedspace at a per diem rate in the jail of another county. Put differently, the question is whether the proposed per diem arrangements would fit within the authorization for shared jails contained in CS § 11-102 and would render the County a "party to the operation and maintenance" of another county's jail, thereby allowing Kent County judges to sentence people to terms of confinement there under CS § 9-105(2). We do not think so.

The statutes on shared jails do not set out the "precise form of the cooperative endeavor" that they envision. 68 *Opinions of the Attorney General* at 202. Nor, so far as we are aware, have any shared jails actually been established under the statutes. *Cf.* 61 *Opinions of the Attorney General* 24, 27 (1976) (concluding that a proposal for a bi-county jail to be established under the statutes did not align with the language of an appropriation enacted to support the facility). Nonetheless, we think the statutory language at least makes clear that, to establish a shared jail, the counties involved must share responsibility for the facility itself. All of the relevant provisions refer to collaboration with respect to a *facility*, not with respect to detainees alone. *See* CS § 11-102(b)(1) (referring to the "allocation of responsibility, construction, operation, maintenance, and appointment of personnel in connection with a local correctional facility"); CS § 11-103(b) (referring to "a local correctional facility operated by more than one county"); CS § 11-104(e)(1) (authorizing State financial assistance "if a county that maintains, operates, or participates in a local correctional facility provides for improvements to the local correctional

facility"); CS § 9-105(2) (requiring the county to be "a party to the operation and maintenance *of the local correctional facility*" (emphasis added)).

A per diem contract does not satisfy this requirement. Such a contract makes the sending county responsible for its *detainees* and their expenses, not for the host county's *facility*. Two examples illustrate that point.

First, the federal government often enters into such contracts with local facilities, *see* 18 U.S.C. § 4002, and we doubt anyone would maintain that it becomes "a party to the operation and maintenance" of those facilities as a result. The federal government simply pays to put up its detainees there. *See Logue v. United States*, 412 U.S. 521, 528-30 (1973) (explaining that under a contract of this nature, the federal government's role is "limited to the payment of sufficiently high rates to induce" the local jail "to do a good job" and does not involve control by the federal government over "day-to-day operations"). This point holds true even where the per diem contract sets out—as such contracts sometimes do—certain standards of treatment that the facility must meet. *See id.* at 529-30. Such contractual standards still do not give the purchasing government any role in running the facility itself; they simply serve to safeguard the detainees for which the purchasing government bears responsibility. *See id.* at 530.

Second, under Maryland law, even a person incarcerated in a county jail must sometimes pay their own expenses if they are employed while incarcerated. *E.g.*, CS § 11-718(e); *see generally* Littman, *supra* note 4, at 888-89 (noting that "detainees are regularly charged for the daily cost of their room and board" in county jails). But no one would suggest that the incarcerated individual is a "party" to the operation and maintenance of the jail. To become "a party to the operation and maintenance" of a jail, then, we think a county must do something more than enter into an agreement to pay its detainees' way. Again, the statutory language suggests that the parties to a shared jail agreement must share responsibility for the *facility*, not just the detainees. *See, e.g.*, CS § 11-103(b).

Further, if the General Assembly had intended to authorize a county to overcome the need for a county jail by purchasing jail services elsewhere, we think it would have said so expressly and not buried the authorization in legislation allowing counties to establish shared jails. These two types of authorizations—shared jails versus the purchase of jail services—are often treated

separately in other states' statutory schemes.[14]  And where other states authorize counties to rely on the purchase of jail services, the statutes tend to establish guardrails, such as minimum notice of cancellation, to protect the county from being left without adequate bedspace.  *See* Wash. Rev. Code Ann. § 70.48.090(1); *cf.* 71 *Opinions of the Attorney General* 197, 204 (1986) (reasoning that a county's reliance on a privately owned jail "would have serious implications, in that the county would have great difficulty, on short notice, providing for custody of its inmates elsewhere").

In a similar vein, our Legislature has expressly authorized the State to purchase jail services from the counties, CS §§ 11-106(b), 9-304, 9-402(c), and has expressly authorized the counties to sell jail services to the federal government, *id*. § 11-201(a)(2).  But, by contrast, the statutes on shared jails do not contain any express language about counties purchasing jail services from each other. This lack of explicit authorization, set against the explicit statutory authorization of other types of transactions for jail services, suggests that the shared-jail statutes do not empower a county to rely on the purchase of jail services for its correctional needs.  We reached a similar conclusion in an opinion that determined that local governments lacked authority to transfer custody of detainees to out-of-state jurisdictions.  *See* 93 *Opinions of the Attorney General* at 99-100.  There, we reasoned that the General Assembly had explicitly authorized other forms of local government cooperation with out-of-state governments and that its failure to explicitly authorize the custody transfers therefore suggested that local governments could not conduct them.  *Id.*  The point is that in the local corrections context, the General Assembly tends to authorize joint arrangements explicitly, and it has not done so here.

We also think it important that a shared jails program has different policy ramifications than a system that allows counties to rely exclusively on the purchase of jail services.  A county that participates in running a shared jail remains substantially accountable to the public for the quality of the facility and the treatment of its detainees.  *See* CS § 9-105(2) (referring to the

---

[14] *Compare* Texas Code Ann., Local Gov't § 351.003 (authorizing "contracts with another county to incarcerate [a county's] prisoners" at a "daily per capita rate") *and* Wash. Rev. Code Ann.§ 70.48.090 (authorizing "[c]ontracts for jail services" between local governments that "give one governing unit the responsibility for the operation of the jails"), *with* Tex. Code Ann., Local Gov't 351.031 (authorizing contracts between two or more counties "for the joint operation of a jail"), *and* Wash. Rev. Code Ann. § 70.48.095 (authorizing "regional jails" that are "created and operated between two or more local governments").

county as a "party" to the jail). In contrast, a county that merely pays another jurisdiction to house its detainees does not retain the same level of accountability for the workings of the facility in question. *See* Littman, *supra* note 4, at 894 ("[B]ecause per diem checks and detainee transport vans are crossing jurisdictional lines, contracting delocalizes and therefore undermines accountability."). Even if a per diem contract requires the other jurisdiction's facility to meet certain standards, it is ultimately the other jurisdiction that controls how the facility operates. *See Logue*, 412 U.S. at 529-30. We discussed similar principles in a 1986 opinion that recognized a limitation on a county's authority to buy jail services from private companies. 71 *Opinions of the Attorney General* at 203. We concluded that, while a charter county may contract out the operation of the county jail to a private entity, the county "cannot wholly abdicate its responsibility" for the jail. *Id*. The county must retain some control over the facility. *Id*.

This is not to say that the General Assembly could not, if it wished, explicitly authorize Kent County to pursue the proposal in question here. As mentioned, the General Assembly has authorized some other types of transactions for jail services, and it could reasonably authorize the County to close its jail in reliance on such transactions (as other state legislatures have done). *See infra* Part II.C (noting policy options). But the relevant policy considerations reinforce our view that, if the General Assembly had intended to authorize counties to rely exclusively on the bedspace market for detainee housing, it would not have done so through a statute that only authorizes shared jails.

For all these reasons, we do not think that per diem arrangements make a purchasing county a "party" to the "operation and maintenance" of another county's jail. We recognize, however, that this conclusion still leaves a substantial amount of uncertainty about the level of responsibility that Kent County must accept to satisfy this requirement.

Although we decline to explore hypotheticals about the minimum level of participation needed to satisfy the "party" requirement, we offer two observations to clarify our interpretation of the statute. First, arrangements primarily based on a per diem fee structure are unlikely to suffice, regardless of whether the purchasing county also accepts other minor obligations on top of these fees. The driving principle, again, is accountability for the government function of running a jail. *See* 71 *Opinions of the Attorney General* at 203. If a county's primary connection to a facility is the purchase of bedspace there, that county is essentially

in the bedspace market and is less likely to assume direct responsibility for conditions of confinement than a county that invests substantial time and resources into the operation of the facility itself. Second, the smaller the county's stake in a purportedly shared facility, the greater the risk that a sentencing court in that county would determine that it lacks authority to commit offenders there under CS § 9-105. Counties can avoid this risk by dividing financial and operational responsibilities equally or according to some objective metric, such as the respective size of each county's population or the historical size of its jail population. In our view, a county that seeks to rely solely on bedspace in another jurisdiction's facility without assuming a serious share of responsibility for operations there should, given the obvious need to comply with CS § 9-105, seek legislative approval of its endeavor before shuttering its only jail. *See* 66 *Opinions of the Attorney General* 118, 119 (1981) (counseling resort to the Legislature where a proposal would "suddenly alter th[e] status quo" and does not appear to "comport[] with the true intent of the General Assembly").

In sum, we do not think that the statutes authorizing counties to set up joint jail facilities can reasonably be interpreted to authorize a county to rely exclusively on the purchase of jail services from other counties to meet detainee needs.

## C.    *Other Considerations*

Because you asked about the proposal to close the County's only jail, we do not offer any opinion about the legality of the detainee transfers that have already occurred under the County's existing per diem contract with Queen Anne's County. Depending on the circumstances, those transfers may fall within your authority as Sheriff to hold detainees outside of the county jail under exigent circumstances, *see* 93 *Opinions of the Attorney General* at 92, or within the scope of statutes that authorize detainee transfers, *e.g.*, CS § 9-301 (governing the transfer of a defendant in a case removed to another county); CS § 9-303(2) (authorizing transfers from local to State custody if "the local correctional facility is not equipped to properly provide the necessary treatment or detention"); CS § 11-206 (governing transfers of pregnant detainees); *cf.* 93 *Opinions of the Attorney General* at 92 (emphasizing that transfers of custody require statutory authority).[15]

---

[15] To be clear, although the County may name a different official to serve as jailer, if it leaves you (as Sheriff) in this role, it may not *require* you to transfer detainees to another county. *See* 33 *Opinions of the Attorney General* 219, 220-21 (1948).

Here, we conclude only that the County may not do away with its own jail entirely by relying on such per diem contracts.

We also emphasize that we make no statement here about the policy merits of the County Commissioner's proposal. As mentioned, other states explicitly authorize counties to take the approach the proposal outlines. The General Assembly might decide to confer the same authority on Maryland counties. *Cf.* Littman, *supra* note 4, at 893-94 (discussing policy issues related to "interjurisdictional bedspace sharing" in county jails). We think, however, that existing law does not give the County this authority.

### III
### Conclusion

In our opinion, Kent County may not opt to close its only jail and provide for detainees exclusively by purchasing jail services from other counties. The County must maintain a jail of its own or join with one or more other counties to operate a truly shared jail.

Anthony G. Brown
Attorney General of Maryland

Ben Harrington
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions & Advice